## UNITED STATES v. HEINSZEN & COMPANY.

### APPEAL FROM THE COURT OF CLAIMS.

No. 580.   Argued April 9, 10, 1907.—Decided May 27, 1907.

Congress in dealing with the Philippine Islands may delegate legislative authority to such agencies as it may select and may ratify the acts of agents as fully as if such acts had been specially authorized by a prior act of Congress.

The act of June 30, 1906, 34 Stat. 636, legalizing and ratifying the imposition and collection of duties by the authorities of the United States in the Philippine Islands prior to March 8, 1902, was within the power of Congress and can be given effect without depriving persons who had paid such duties of their property without due process of law or taking their property for public use without compensation in violation of the Fifth Amendment.

The mere commencement of a suit does not affect the right of Congress to ratify executive acts and the fact that at the time the ratifying statute was enacted actions were pending for the recovery of sums paid does not cause the statute to be repugnant to the Constitution.  References in *De Lima* v. *Bidwell*, 182 U. S., as to want of power to ratify after suit brought are to be regarded as *obiter dicta*.

THE facts are stated in the opinion.

*The Attorney General, the Solicitor General* and *Mr. Assistant Attorney General Van Orsdel,* with whom *Mr. George M. Anderson* was on the brief, for appellant:

This case is essentially different from the case of *Warner, Barnes & Co.* v. *United States,* 197 U. S. 419. "The judgment in that case was *res adjudicata* only of the issue then presented, of the facts as they then appeared, and of the legislation then existing." *Utter* v. *Franklin,* 172 U. S. 416. Here the issues are altogether new—the lack of protest and the power of Congress to ratify under the new act of 1906. The matter of protest was not raised before until rehearing, and the court will recall the suggestion then made from the bench that the defense came too late. Here it has been emphasized from the start.

The petition asserts actual duress because the regulations provided that vessels should be placed under military guard until discharge. That regulation applied, of course, to all vessels, and would excuse failure to protest on importations from foreign countries as well as from the United States. The phrase "military guard" means only *customs control,* and that is the very term employed in the amendment to this particular paragraph of the regulations dated May 24, 1899. The law and customs regulations of the United States require exactly the same control by boarding, examination and custody pending discharge under civilian inspectors. If this was duress, then the same compulsion and extortion to prevent smuggling and secure duties are practiced daily at all ports of the United States.

If there is no compulsion, payment is voluntary and protest will not avail. Where there can be a recovery, protest is necessary. It is so in all tax cases and especially in customs cases.

Protest is doubtless and necessarily a rule of all customs law. It was the rule of the Spanish law of the Philippines, which was equivalent to an express statute. It was the rule of these regulations (par. 10). Of course this is a customs case, although not one under the Customs Administrative Act of

the United States. Counsel say not, that it is military contribution. But their previous victory rested on the basis that the *military* exaction ceased on April 11, 1899.

There was no protest or objection whatever here. The claim was an afterthought, and the courts do not regard that position with favor. It is noticed in *Dewell* v. *Mix,* 116 Fed. Rep.; a customs case, and in similar terms in *Newhall* v. *Jordan,* 149 Fed. Rep., advance sheets, and the objection is concisely put in the *Chesebrough case,* 192 U. S. 253; and see also the *Edmonston case,* 181 U. S. 504.

No distinction can be drawn because here the suit is against the United States and not against the agent. *Elliott* v. *Swartwout,* 10 Pet. 153.

The act of 1906 encounters the limitations of *De Lima* v. *Bidwell,* 182 U. S. 1, and has done so in clear terms, from which there is no escape so far as intention is concerned.

*De Lima* v. *Bidwell* simply holds that an act not retroactive in terms could not have that effect as to duties theretofore paid under protest for which an action to recover back had already been brought.

But see *Grim* v. *School District,* dealing with taxation for the public use, to effect that if an act of assembly be within the legitimate scope of legislative power, it is not a valid objection that it divests vested rights even after suit brought; that if the legislature had the antecedent power to authorize a tax, they could cure a want of authority as well as a mere irregularity in levying it by a retroactive law. If the use is public, if it is taxation, the rule against divesting vested rights for private benefit does not apply. It was not the less taxation because the tax was levied without authority at the time, and the question now is as to the effect of the validating act. It was taxation and just taxation although not valid taxation.

There was due process of law through protest and appeal which the claimants failed to invoke at the proper time. The claimants have no equities; they collected the duties from their customers and they received the usual compensation

for a tax in the maintenance of a Government which made life and property safe and their business possible. In the *De Lima case* the retroactive intention and effect were not clear, and protest was duly made. Here the case is quite otherwise as to both matters.

This is a question of constitutional power, not of expediency or even fairness, although no just mind need shrink from giving full effect to this law on the ground that it is repugnant to the spirit of our institutions or the principles of natural justice.

Counsel say that our authorities do not apply, because before the Fourteenth Amendment was adopted the only restraint on the States in this domain was as to impairing the obligation of contracts or passing *ex post facto* laws. There is no case which says that the law which did not impair a contract or was not *ex post facto* was not however due process of law and yet could be enforced. For the most part the authorities on retroactive legislation cited in the opposing brief either do not refer to taxation at all but to the familiar case (as in *Wilkinson* v. *Leland, Palairet's Appeal,* etc.) of transferring the property of A. to B. and thus divesting vested estates; or else, in the tax cases, the citizen had never had his day in court at all, at any time, or the act was only *intended* to cure irregularities and not to validate a total want of authority.

As to what is a vested right see Kent's definition, "An immediate right of present enjoyment or a present *fixed* right of future enjoyment;" and Cooley's, "Rights are vested in contradistinction to being expectant or contingent. They are vested when the right of enjoyment, present or prospective, has become the property of some particular person or persons, as a present interest." Now if our military authorities should take some tangible piece of property for the use of the Quartermaster's Department, let us say, without any relation, of course, to the owner's obligation to contribute his share to the support of Government, that would be a taking of private

property for public use, and compensation would be due. That right would be vested by the Constitution. The right here involved is property, in a qualified sense, because it is a right of action; but it is not a vested right. It is not manifestly contingent—a mere right of action. Such a right of action is not to be regarded as vesting or as constituting property until recovery has been finally adjudged. The bringing of suit is the mere assertion of an undetermined right. Before judgment all is contingent; the right is inchoate, not complete; there is a right to bring suit which may of course be taken away before suit brought, but the included and underlying right of property into which the action may eventually ripen is only inchoate. *Evans* v. *McFadden*, 105 Fed. Rep. 293, affirmed 185 U. S. 505.

By the act of 1906 Congress did not take any right of the claimants vested beyond the power of the legislature. The fact that the right will not be beyond controversy unless and until this court adjudges this case in their favor is proof of that statement. The act in effect said, as it constitutionally might do—In these cases the United States, the sovereign, declines to be sued; it withdraws its consent; so far at least as such claims are concerned, not already reduced to judgment, it denies the right to sue.

*Mr. Frederic R. Coudert* and *Mr. Henry M. Ward,* with whom *Mr. John G. Carlisle* and *Mr. Paul Fuller* were on the brief, for appellees:

The decisions of this court in *De Lima* v. *Bidwell, Dooley* v. *United States* and *Lincoln and Warner Barnes* v. *United States* hold that Congress has not the power to ratify the collection of moneys exacted without warrant of law under the circumstances disclosed by the record now before the court.

As to the power of Congress to ratify the illegal exaction of moneys after suit brought for their recovery, see *De Lima* v. *Bidwell,* 182 U. S. 1, 199.

Legislatures cannot by retroactive laws impair vested

rights without violating the provision common to both state and Federal constitutions—that no man shall be deprived of his property without due process of law. *Kennett's Petition,* 24 N. H. 139; *Alter's Appeal,* 67 Pa. St. 341; *Norman v. Heist,* 5 W. & S. 171; *Donovan v. Pitcher,* 53 Alabama, 411; *Palairet's Appeal,* 67 Pa. St. 479; *State v. Warren,* 28 Maryland, 338.

Congress cannot validate the illegal action of the officers of the Government in exacting moneys from these claimants under the guise of duties but without any warrant of law, after, as in the case at bar, suit has been instituted for their recovery.

"The supposition that the Government will not pay its debts, or will not do justice is not to be indulged." *Gibbons v. United States,* 8 Wall. 274.

The act of 1906 must not be interpreted as in conflict with *De Lima v. Bidwell* and *Warner, Barnes & Co. v. United States,* unless no other construction can be adopted. If the court cannot adopt the construction suggested, then the decisions of this court in *De Lima v. Bidwell* and the *Lincoln and Warner Barnes* case on this point are conclusive and require this court to hold that with respect to the rights of these claimants and of others similarly situated, the act of June 30, 1906, is of no effect.

In view of the findings of fact in the case at bar, the decision of this court in *Dooley v. United States,* and *Lincoln and Warner Barnes v. United States,* are conclusive upon the question of voluntary payment.

The facts as found by the Court of Claims in this case establish the legal conclusion that the payment of the duties was involuntary.

The final fact to be ascertained by the court must be not what was the actual state of mind of the plaintiff but what, under the circumstances of the particular case was his "legal state of mind;" whether a volunteer or a victim of overweening necessity. *Maxwell v. Griswold,* 10 How. 242, 256; *Robertson v. Frank Brothers,* 132 U. S. 17, 22, 23; 1 Wharton on

Contracts, § 147; *Hackley* v. *Headley*, 45 Michigan, 569, 574, 576.

The rule of law being thus clearly settled, what were the admitted, unquestioned facts in this case from which the court must conclude that the payment was involuntary?

When the complainants' vessel arrived from the domestic port of New York at the equally domestic port of Manilla she found herself and her cargo in possession of Federal troops, whose presence, however otherwise desirable, was designed to and very effectually did prevent claimants from taking possession of their goods and plying their trade. This situation, so obviously detrimental to plaintiff's property and business, could only be effectually determined by his paying the ransom demanded, *i. e.*, the alleged duties or military contributions— admittedly illegal exactions.

It is true they might have relinquished the goods to the military guard and abandoned their business and property, or again they might have sailed away, but as this court has said this was only a choice of evils and one which they were not bound to make. It was in fact no choice at all since the theory of free will cannot hold its own against the doctrine of inevitable necessity in the form of imminent and potentially persuasive bayonets.

The importer whose goods are in the safe-keeping of Krag Jorgensens over whose action he has no control, cannot be successfully likened to the man who buys a revenue stamp from the peaceful apothecary and then sues the Government on the ground that he feared the law if he did not stamp his manifest.

The act of June 30, 1906, in so far as it attempts to deprive claimants here of their right to the moneys which the United States have in their hands justly and equitably belonging to claimants is unconstitutional and void.

The Constitution is everywhere applicable to the actions of the Government, the only open question being as to which clauses extend to governmental operation in the new and as

yet "unincorporated" possessions acquired from Spain by the Treaty of Paris. *Dorr* v. *United States*, 195 U. S. 138.

The right to property is fundamental and Congress can no more resort to confiscation in the new lands than elsewhere in our broad domain. *United States* v. *Lee*, 106 U. S. 196; *Sinking Fund Cases*, 99 U. S. 710, 738; *Dent* v. *West Virginia*, 129 U. S. 114, 124.

It is immaterial that the taking of property assumes the guise of taxation: in determining what is due process of law regard must be had to substance, not to form. *Chicago R. R. Co.* v. *Chicago*, 166 U. S. 226, 235; *Union Transit Co.* v. *Ky.*, 199 U. S. 194; *Angle* v. *Chicago R. R. Co.*, 151 U. S. 1, 19; *Sturgis* v. *Carter*, 114 U. S. 511, 519; *United States* v. *Burr*, 159 U. S. 78, 84, 85.

The section of the act of June 30, 1906, under consideration is in substance and effect an *ex post facto* law prohibited by Art. 1, § 9 of the Constitution. It deprives claimants and others similarly situated of their property, of their money held by the United States. The term *ex post facto* has reference to crimes and penalties, but the question is not of the form of the enactment but of its substance and effect.

The substance and effect of this act is to deprive claimants of their property. That is a penalty, a punishment in substance as much as though it were a fine. A fine would have been *ex post facto*, a penalty for having done an act innocent at the time it was done. There is no difference in substance and effect between such a fine and this act now before us. The substance and effect are the same; the difference is in form and verbiage only. The prohibitions in the Constitution are not to be evaded by mere matter of form. These prohibitions annul every act by which the result which they were intended to prevent might be accomplished. *Cummings* v. *Missouri*, 4 Wall. 277, 325.

MR. JUSTICE WHITE delivered the opinion of the court.

In an endeavor to clarify the consideration of this contro-

versy we invert somewhat the order in which the facts have been stated in the findings below and refer to previous rulings of this court pertinent to the subject in hand, besides supplementing the same by a reference to relevant matters of public history, of which we take judicial notice.

After the Philippine Islands came under the military control of the United States the President, on July 12, 1898, issued an order providing for the enforcement by the military power in those islands of a system of tariff duties. This order, promulgated by the Secretary of War, was accompanied with an enumeration of the tariff proposed and regulations for the collection of the same. However, for causes which need not be referred to, the tariff in question was subsequently modified and did not go into operation until November, 1898.

The duties imposed by this tariff were levied on goods coming into the Philippine Islands, whether from the United States or other countries. This tariff was in force when the treaty of peace was signed (December 10, 1898), when the treaty was ratified (April 11, 1899), and was continued by the Philippine Commission appointed by the President in April, 1900. Indeed, the civil government, as established in the islands by the President, either in virtue of his inherent authority or as a result of the power recognized and conferred by the act of Congress, approved March 2, 1901 (31 Stat. L. 910), continued the original tariff in force, except as to some modifications not material to be noticed, and formulated its provisions in the shape of a legislative act entitled "An act to revise and amend the tariff laws of the Philippine Archipelago." And this tariff was in force in March, 1902, when it was expressly approved and continued by Congress. 32 Stat. 54.

In December, 1901, the cases of *De Lima* v. *Bidwell* and *Dooley* v. *United States* were, by this court, decided. 182 U. S. 1, 222. The first case involved the right to recover duties paid under protest to the collector of the port of New-York upon sugar brought into the United States from the island of Porto Rico during the autumn of 1899 and subsequent to

the cession of the island. The second case involved the right to recover the amount of certain duties on goods carried into Porto Rico from the United States between July 6, 1898, and May 1, 1900, the duties in question having been levied by authority of the general in command of the army of occupation or subsequently by order of the President as commander-in-chief. In the first case (*De Lima* v. *Bidwell*) it was decided that, as the effect of the ratification of the treaty was to take the island of Porto Rico out of the category of foreign territory within the meaning of that word as used in existing tariff laws of the United States, no right remained to enforce, against goods coming from Porto Rico into the United States, the previously enacted tariff of duties, although, considering the terms of the treaty and the relation of the island to the United States, Congress had power to impose a tariff on goods coming from that island into the United States. As a corollary of the doctrine announced in *De Lima* v. *Bidwell*, in the second case (*Dooley* v. *The United States*) it was held that whilst the President, as commander-in-chief, had authority to impose tariff duties in Porto Rico on goods coming into that country from the United States prior to the ratification of the treaty, no such executive power existed after that ratification. It was consequently held that none of the duties paid prior to the ratification of the treaty could be recovered, whilst those paid subsequently could be.

In the following year (December 2, 1901) another case, entitled *Dooley* v. *The United States*, was decided. 183 U. S. 151. That case involved the validity of tariff duties levied in Porto Rico on goods brought into that island from the United States, the duties in question having been imposed after the ratification of the treaty and in and by virtue of the act of Congress known as the Foraker Act. Applying the principles announced in the previous cases just referred to, it was held that the duties were lawful because, although collected after the ratification, they were imposed not simply by virtue of the authority of the President, acting under

the military power, but in conformity to a valid act of Congress.

And on the same day with the foregoing the case of *Fourteen Diamond Rings* was decided. 183 U. S. 176. That case involved the validity of tariff duties levied on diamond rings brought from the Philippine Islands into the United States. Adhering to the doctrine settled by the prior rulings, it was held that, as the Philippine Islands, by the ratification of the treaty, had ceased to be foreign within the meaning of the tariff laws, the imposition of the duties complained of was unlawful. In the course of the opinion the effect of the treaty as applied in the previous cases to Porto Rico was pointed out, and the status of the Philippine Islands in virtue of the treaty was, in effect, held to be controlled by the former decisions.

In April, 1905, the two cases of *Lincoln* v. *The United States* and *Warner, Barnes & Co., Limited,* v. *The United States* were by this court decided. 197 U. S. 419. The cases came here one on error to the District Court of the United States for the Southern District of New York, and the other by appeal from the Court of Claims. The one (*Lincoln case*) was commenced on March 29, 1902; the other (*Warner, Barnes & Co. case*) on January 17, 1902. In both cases recovery from the United States was sought of the amount of duty paid upon goods taken from the United States into the Philippine Islands after the ratification of the treaty with Spain and before the passage of the act of Congress of March 8, 1902. Reversing the judgments which had been rendered below in both cases in favor of the United States, it was declared that there was nothing in the situation of the Philippine Islands which took that territory out of the reach of the doctrine announced in the previous cases which we have reviewed, and it was therefore decided that the President was without power, after the ratification of the treaty, in the absence of express authority from Congress, to impose the tariff duties in question. A contention on the part of the United States that Congress by the second section of the act approved July 1, 1902 (entitled "An act

temporarily to provide for the administration of the affairs of civil government in the Philippine Islands, and for other purposes "), had ratified the action of the President in imposing and collecting the duties in controversy, therefore no recovery could be had, was held to be unfounded, for grounds stated in the opinion, to which we shall hereafter advert. The case was heard upon rehearing, and in a decision announced on May 28, 1906, the views previously entertained by the court were reiterated and adhered to. 202 U. S. 484. In the month following (June, 1906) Congress passed an act containing a provision which reads as follows (34 Stat. L. 636):

"That the tariff duties, both import and export, imposed by the authorities of the United States or of the provisional military government thereof in the Philippine Islands prior to March eight, nineteen hundred and two, at all ports and places in said islands, upon all goods, wares, and merchandise imported into said islands from the United States, or from foreign countries, or exported from said islands, are hereby legalized and ratified, and the collection of all such duties prior to March eight, nineteen hundred and two, is hereby legalized and ratified and confirmed as fully to all intents and purposes as if the same had by prior act of Congress been specifically authorized and directed."

Now this case was commenced, after the decision in the *Fourteen Diamond Rings*, to recover the amount of tariff duties exacted in the Philippine Islands on merchandise brought from the United States, the duties having been collected under the authority of the order of the President after the ratification of the treaty, but before the time when Congress, by § 1 of the act of March 8, 1902, had enacted tariff duties for the Philippine Islands. The case was pending in the Court of Claims when the *Lincoln and Warner, Barnes & Co. cases* were decided by this court. It was found by the court below that the military officers of the United States collected the duties and paid over the amount thereof to the treasurer of the Philippine Islands, and that the money was disbursed for the expenses of that

government without going into the Treasury of the United States. Considering that the original illegality of the duties complained of was established by the previous decisions of this court, and that the act of Congress of June 30, 1906, ratifying the collection of duties was beyond the power of Congress to enact, the court below rendered judgment against the United States for the amount of duties paid.

Applying the doctrine settled by this court in the cases to which we have referred, concerning the power to levy tariff duties under the authority of the President, on goods taken from the United States into Porto Rico and the Philippine Islands, or brought into the United States from either of such countries subsequent to the ratification of the treaty and prior to the levy by Congress of tariff duties, it is obvious that the court below correctly held that such tariff exactions were illegal. It follows therefore that the only question open for consideration is whether the court below erred in refusing to give effect to the act of Congress of June 30, 1906, which ratified the collection of the duties levied under the order of the President.

As the text of the act of Congress is unambiguous and manifests as explicitly as can be done the purpose of Congress to ratify, the case comes to the simple question whether Congress possessed the power to ratify which it assumed to exercise. When the controversy is thus reduced to its ultimate issue we think the error committed by the court below, both in reason and authority, is readily demonstrable.

That where an agent, without precedent authority, has exercised in the name of a principal a power which the principal had the capacity to bestow, the principal may ratify and affirm the unauthorized act, and thus retroactively give it validity when rights of third persons have not intervened, is so elementary as to need but statement. That the power of ratification as to matters within their authority may be exercised by Congress, state governments or municipal corporations, is also elementary. We shall not stop to review the whole subject or cite the numerous cases contained in the books dealing with

the matter, but content ourselves with referring to two cases as to the power of Congress, which are apposite and illustrative. In *Hamilton* v. *Dillin*, 21 Wall. 73, the facts were as follows: During the Civil War the Secretary of the Treasury, with the sanction of the President, adopted rules and regulations for granting permits to trade between the belligerent lines. One of these rules exacted the payment of a contribution, styled a fee, of four cents a pound on cotton purchased. Hamilton having taken a permit and paid Dillin, surveyor of the port of Nashville, Tennessee, under the regulations, a sum of money for a permit to trade in cotton, sued to recover the same as having been illegally exacted. In deciding the case (p. 88) the court came to consider whether "the action of the executive was authorized, or, if not originally authorized, was confirmed by Congress." Both these questions were determined in the affirmative. When the court came to consider the legislation relied upon as having confirmed the acts of the President in establishing the regulations in question, after stating the same the court declared, "We are also of opinion that the act of July 2, 1864, recognized and confirmed the regulations in question." *Mattingly* v. *The District of Columbia*, 97 U. S. 687, concerned the validity of an act of Congress in effect confirming the doings of the board of public works of the District of Columbia touching the improvement of streets and roads and ratifying certain void assessments for street improvements. The court said (p. 690):

"We do not propose to inquire whether the charges of the bill are well founded. Such an inquiry can have no bearing upon the case as it now stands; for were it conceded that the board of public works had no authority to do the work that was done at the time when it was done, and consequently no authority to make an assessment of a part of its cost upon the complainant's property, or to assess in the manner in which the assessment was made, the concession would not dispose of the case, or establish that the complainants have a right to the equitable relief for which they pray. There has been Congres-

sional legislation since 1872, the effect of which upon the assessments is. controlling.   There were also acts of the legislative assembly of the District, which very forcibly imply a confirmation of the acts and assessments of the board of which the bill complains.   If Congress or the legislative assembly had power to commit to the board the duty of making the improvements, and the power to prescribe that the assessments should be made in the manner in which they were made, it had power to ratify the acts which it might have authorized.   And the ratification, if made, was equivalent to an original authority, according to the maxim, '*Omnis ratihabitio retrotrahitur et mandato priori æquiparatur.*'   Under the Constitution Congress had power to exercise exclusive legislation in all cases whatsoever over the District, and this includes the power of taxation.   *Cohen* v. *Virginia*, 6 Wheat. 264.   Congress may legislate within the District, respecting the people and property therein, as may the legislature of any State over any of its subordinate municipalities.   It may therefore cure irregularities, and confirm proceedings which without the confirmation would be void, because unauthorized, provided such confirmation does not interfere with intervening rights."

It is then evident, speaking generally, both on principle and authority, that Congress had the power to pass the ratifying act of June 30, 1906, and that that act bars. the plaintiff's right to recover, unless by the application of some exception this case is taken out of the operation of the general rule.   And this brings us to consider the several propositions relied upon at bar to establish that such is the case.

First.   Whilst it is admitted that Congress had the power to levy tariff duties on goods coming into the United States from the Philippine Islands or coming into such islands from the United States after the ratification of the treaty, it is yet urged that as that body was without authority to delegate to the President the legislative power of prescribing a tariff of duties, it hence could not by ratification make valid the exercise by the President of a legislative authority which could not have

been delegated to him in the first instance. But the premise upon which this proposition rests presupposes that Congress in dealing with the Philippine Islands may not, growing out of the relation of those islands to the United States, delegate legislative authority to such agencies as it may select, a proposition which is not now open for discussion. *Dorr* v. *United States,* 195 U. S. 133.

Second. As the duties collected were illegal, it is insisted that for the purpose of testing the validity of the act of Congress the fact of such collection must be put out of view, and the act ratifying the exaction must be treated as if it were solely an original exercise by Congress of the taxing power. This being done, it is said, reduces the case to the inquiry, Had Congress power, years after goods which were entitled to free entry had been brought into the Philippine Islands, to retroactively impose tariff duties upon the consummated act of bringing the goods into that country? But the proposition begs the question for decision, by shutting out from view the potential fact that when the goods were brought into the Philippine Islands there was a tariff in existence under which duties were exacted in the name of the United States. Indeed the contention goes further even than this, since it entirely disregards the important consideration that although the duties were illegally exacted the illegality was not the result of an inherent want of power in the United States to have authorized the imposition of the duties, but simply arose from the failure to delegate to the official the authority essential to give immediate validity to his conduct in enforcing the payment of the duties. And when these misconceptions are borne in mind it results that the unsoundness of the proposition relied upon is demonstrated by the application of the elementary principle of ratification to which we have previously referred. Moreover, the fallacy which the proposition involves becomes yet more obvious when it is observed that the contention cannot even be formulated without misstating the nature of the act of Congress; in other words, without treating that act as retrospective legislation

enacting a tariff, when on its very face the act is but an exercise of the conceded power dependent upon the law of agency to ratify an act done on behalf of the United States which the United States could have originally authorized.

Third. It is urged that the ratifying statute cannot be given effect without violating the Fifth Amendment of the Constitution, since to give efficacy to the act would deprive the claimants of their property without due process of law, or would appropriate the same for public use without just compensation. This rests upon these two contentions: It is said that the money paid to discharge the illegally exacted duties after payment, as before, " justly and equitably belonged" to the claimants, and that the title thereto continued in them as a vested right of property. It is consequently insisted that the right to recover the money could not be taken away without violating the Fifth Amendment, as stated. But here, again, the argument disregards the fact that when the duties were illegally exacted in the name of the United States Congress possessed the power to have authorized their imposition in the mode in which they were enforced, and hence from the very moment of collection a right in Congress to ratify the transaction, if it saw fit to do so, was engendered. In other words, as a necessary result of the power to ratify, it followed that the right to recover the duties in question was subject to the exercise by Congress of its undoubted power to ratify. To hold to the contrary would be to say that whilst the unauthorized act of an officer done on behalf of the United States was subject to ratification by the United States, yet if the officer acted without authority the act when performed annihilated the power to ratify; that is, that the very condition which engendered the power destroyed it.

But if it be conceded that the claim to a return of the moneys paid in discharge of the exacted duties was in a sense a vested right, it in principle, as we have already observed, would be but the character of right referred to by Kent in his Commentaries, where, in treating of the validity of statutes retroactively operating on certain classes of rights, it is said (Vol. 2. pp. 415, 416):

"The legal rights affected in those cases by the statutes were deemed to have been vested subject to the equity existing against them, and which the statutes recognized and enforced. *Goshen* v. *Stonington,* 4 Connecticut 209; *Wilkinson* v. *Leland,* 2 Peters, 627; *Langdon* v. *Strong,* 2 Vermont, 234; *Watson* v. *Mercer,* 8 Peters, 88; 3 Story's Comm. on the Constitution, 267."

Nor does the mere fact that at the time the ratifying statute was enacted this action was pending for the recovery of the sums paid cause the statute to be repugnant to the Constitution. The mere commencement of the suit did not change the nature of the right. Hence again if it be conceded that the capacity to prosecute the pending suit to judgment was in a sense a vested right, certainly also the power of the United States to ratify was, to say the least, a right of as high a character. To arrogate to themselves the authority to divest the right of the United States to ratify is then in reason the assumption upon which the asserted right of the claimants to recover must rest.

Considering how far the bringing of actions would operate to deprive government of the power to enact curative statutes which, if the actions had not been brought, would have been unquestionably valid, Cooley, in his Constitutional Limitations, says (7th ed., p. 543):

"Nor is it important, in any of the cases to which we have referred, that the legislative act, which cures the irregularity, defect or want of original authority, was passed after suit brought, in which such irregularity or defect became matter of importance. The bringing of suits vests in a party no right to a particular decision; *Bacon* v. *Callender,* 6 Massachusetts, 303; *Butler* v. *Palmer,* 1 Hill, 324; *Cowgill* v. *Long,* 15 Illinois, 202; *Miller* v. *Graham,* 17 Ohio St. 1; *State* v. *Squires,* 26 Iowa, 340; *Patterson* v. *Philbrook,* 9 Massachusetts, 151, and his case must be determined on the law as it stands, not when the suit was brought, but when the judgment is rendered. *Watson* v. *Mercer,* 8 Pet. 88; *Mather* v. *Chapman,* 6 Connecticut, 54; *People* v. *Supervisors &c.,* 20 Michigan, 95; *Satterlee* v. *Matthewson,* 16

S. & R. 169, and 2 Pet. 380; *Excelsior Mfg. Co.* v. *Keyser,* 62 Mississippi, 155; *Phenix Ins. Co.* v. *Pollard,* 63 Mississippi, 641; *McLane* v. *Bonn,* 70 Iowa, 752, 30 N. W. Rep. 478; *Johnson* v. *Richardson,* 44 Ark. 365. . . ."

And the following cases, in various forms, illustrate the application of the principle: *United States* v. *Morris,* 10 Wheat. 246; *Grim* v. *School Dist.,* 57 Pa. St. 433, 438; *City of Chester* v. *Black,* 132 Pa. St. 568; *Price* v. *Huey,* 22 Indiana, 18; *Welch* v. *Wadsworth,* 30 Connecticut, 149, 158; *Rich* v. *Flanders,* 39 N. H. 310, 311; *Iowa Railroad Land Co.* v. *Soper,* 39 Iowa, 112, 119; *Ferry* v. *Campbell,* 110 Iowa, 290; *Mills* v. *Geer,* 111 Georgia, 275, 279, 287, 288.

Fourth. Aside, however, from principle and the general result of the adjudged cases, it is finally insisted that the want of power in Congress to ratify the collection of the duties in question under the circumstances here disclosed conclusively results from the decision in *De Lima* v. *Bidwell,* 182 U. S. 1. As we have seen, that case concerned the validity of collections of duties in the port of New York on goods brought into the United States from Porto Rico, and whilst insisting on the legality of the duties, the Government at the same time urged that, even if originally invalid, they had yet been ratified as the result of provisions of a specified act of Congress which had been passed after the suit to recover the duties had been commenced. As that portion of the duties sued for which had been collected after ratification of the treaty were decided to be illegal, it followed that a decision as to the question of ratification was required. In passing upon the subject, after intimating doubt as to whether the act relied upon, as manifesting the intention of Congress to ratify, was intended to have that effect, it was remarked (p. 199):

"It can clearly have no retroactive effect as to moneys theretofore paid under protest, for which an action to recover back had already been brought. As the action in this case was brought March 13, 1900, eleven days before the act was passed, the right to recover the money sued for could not be taken away by a

subsequent act of Congress. Plaintiffs sue in assumpsit for money which the collector has in his hands, justly and equitably belonging to them. To say that Congress could by a subsequent act deprive them of the right to prosecute this action, would be beyond its power. In any event, it should not be interpreted so as to make it retroactive. *Kennett's Petition,* 24 N. H. 139; *Alter's Appeal,* 67 Pa. St. 341; *Norman* v. *Heist,* 5 W. & S. 171; *Donovan* v. *Pitcher,* 53 Alabama, 411; *Palairet's Appeal,* 67 Pa. St. 479; *State* v. *Warren,* 28 Maryland, 338."

Now, considering the language just quoted in connection with the doubt expressed as to the import of the alleged ratifying statute, it results that the reasoning employed stated two considerations, first, the want of power in Congress to ratify after suit brought; and second, the duty of construing the statute relied upon so as not to produce ratification, in view of its ambiguity. As the question of construction was last stated and that question was declared to be "in any event" decisive, we think the observations made concerning the want of power to ratify after suit brought must be regarded as not having been necessary to the decision rendered, and therefore must be treated as obiter. And this interpretation was, we think, applied in the cases of *Lincoln* v. *United States* and *Warner, Barnes & Co.* v. *United States, supra.* In those cases, as we have said, one of the defenses insisted upon by the Government was a ratification alleged to have been operated by the act of Congress of July 1, 1902, which was passed after the bringing of the actions to recover. It is patent on the face of the opinion announced on the original hearing that the decision was exclusively based upon the ground that the act of Congress was so ambiguous concerning the ratification relied upon that it should not be implied that such ratification was contemplated. And it is to be observed that *De Lima* v. *Bidwell* was not overlooked, since that case was referred to in the course of the opinion. On the rehearing the case was argued on questions submitted by the court, viz., whether the act relied upon manifested the purpose to ratify, and if it did, whether Congress had

· power so to do.. In the opinion on the rehearing, while the court reiterated the view previously expressed, that the act . could not be treated as ratifying the collection of the duties sought to be recovered because of its ambiguity in that regard, yet it, expressly recognized the power in Congress to ratify, and in effect declared that·as to those things to which the alleged ratifying act clearly applied ratification had resulted. This is so, since in the course of the opinion, in answering the argument that the alleged ratifying statute would be meaningless unless it was held applicable to the particular duties in controversy, it was pointed out (p. 499) that there were duties which had been levied and collected other than those in controversy to which the act clearly applied, and " that question (as to them) was put at rest by this ratification." Further, in calling attention to the ambiguity in the ratifying statute relied upon and the resulting doubt whether it embraced all duties, it was pointed out that the fact that actions were pending at the time of the passage of the ratifying act lent cogency to the view that· if Congress had intended by the ratification to affect them, it would have explicitly so declared. On this subject the court said (p. 498):

"This construction is favored by the consideration that the suits had been begun when the act of July 1; 1902, was passed, and that, even if Congress could deprive plaintiffs of their vested rights in process of being asserted, *Hamilton* v. *Dillin*, 21 Wall. 73, still it is not to be presumed to do so on language which, literally taken, has a narrower sense."

Certainly, this language, particularly in view of the reference made to *Hamilton* v. *Dillin*, is wholly incompatible with the conception that the observation as to pending actions made in *De Lima* v. *Bidwell* was to be taken as having settled the proposition that a power to ratify which otherwise obtained could not be exerted after suit brought.

Be this as it may, however, as after deliberate consideration we are of opinion that the mere bringing of this action did not deprive Congress of its power to ratify the collections made by

its officers in the name of the United States of the moneys sought to be recovered in this action, we may not allow the remarks made in *De Lima* v. *Bidwell* under the circumstances stated to control our judgment.

There was much discussion at bar concerning whether the payments of the duties were voluntary. As it would seem that the circumstances surrounding these payments were substantially like unto those existing in the *Lincoln and Warner, Barnes & Co. cases*, in which the opinions of the court made no reference to the question of voluntary payment, we have concluded to pass that question by, as our conclusion on the subject of ratification disposes of the controversy.

*Reversed.*

Mr. Justice Brewer and Mr. Justice Peckham dissent.

Mr. Justice Moody took no part in the decision of the cause.

Mr. Justice Harlan concurring:

By the act of 1906, 34 Stat. 636, Congress legalized, ratified and confirmed, as fully to all intents and purposes as if the same had by prior act been specifically authorized and directed, the collection of all duties, both import and export, imposed by the authorities of the United States or of the provisional military government in the Philippine Islands, prior to March 8, 1902, at all ports and places in said Islands, from the United States or from foreign countries. Interpreted in the light of previous and pending litigation, this act should be construed as denying the authority of any court to take cognizance of a suit brought against the United States to recover any claim arising out of such collections. The act should, therefore, be construed as withdrawing the consent of the United States to be sued on account of claims of that character. In this view, it was error to render judgment against the United States, whatever might be the liability of the collector, if his exaction of

the duties in question was without authority of law. Upon this ground alone, and without considering any of the questions discussed in the opinion of the court, I concur in the judgment of reversal.