PAN AMERICAN STANDARD BRANDS, INC., et al.

v.

UNITED STATES.

C.D. 2115; Protests Nos. 320718–K, etc.

United States Customs Court, Third Division.

Sept. 15, 1959.

Julian O. McConnie, Jr., and Hartzell, Fernandez & Novas, San Juan, P. R. (Jaime Pieras, Jr., San Juan, P. R., of counsel), for plaintiff.

George Cochran Doub, Asst. Atty. Gen. (Richard H. Welsh, New York City, and Margaret M. Kiley, Norwalk, Conn., Stanley R. Segal, San Juan, P. R., as amicus curiae, for defendant.

Before JOHNSON, DONLON, and RICHARDSON, Judges.

RICHARDSON, Judge.

This action was brought to recover customs duties alleged to have been illegally assessed on imported coffee by the collector of customs at the port of San Juan, P. R. It involves four cases which have been consolidated for trial.

The case was submitted upon an oral stipulation of fact entered into at the trial by counsel for the parties. The facts may be summarized briefly as follows:

By congressional enactment, 19 U.S. C.A. § 1319 (section 319, Tariff Act of 1930), the Legislature of Puerto Rico was authorized to levy customs duties on coffee imported into Puerto Rico. Section 1319 reads as follows:

"The Legislature of Puerto Rico is hereby empowered to impose tariff duties upon coffee imported into Puerto Rico, including coffee grown in a foreign country coming into Puerto Rico from the United States. Such duties shall be collected and accounted for as now provided by law in the case of duties collected in Puerto Rico."

Pursuant to the authority contained in the statute quoted above, the Legislature of Puerto Rico, by Act No. 77 of 1931, as amended by Act 7 of 1934, as amended by Act 4 of 1935, imposed a tariff duty upon imported coffee. Section 1 of Act 4 of 1935 provides:

"As soon as this Act takes effect, all coffee brought into Puerto Rico shall pay a duty of fifteen (15) cents a pound on raw coffee and eighteen (18) cents a pound on roasted or ground coffee, which duty shall be collected by the Federal Custom House Service established in Puerto Rico, under such regulations as it may promulgate therefor; *Provided*, That the phrase *brought into Puerto Rico* as used in sections 2201–2205 of this title, means the importation into Puerto Rico of coffee from any foreign country as well as coffee brought to Puerto Rico from any state, territory, district, or possession of the United States or any other place under the jurisdiction of the United States; * * *." [13 L.P.R.A. § 2201.]

Act No. 77 was further amended by Act No. 95 (13 L.P.R.A. § 2201, supp.), approved by the Legislature of Puerto Rico, June 21, 1955. Section 1 of the amending act changed the existing rates of duty on coffee imported into Puerto Rico and authorized the Secretary of Agriculture and Commerce to increase or

reduce the specified rates for certain purposes. Section 1, Act No. 95 (13 L.P.R.A., section 2201, supp.) reads as follows:

"§ 2201. Amount of duty; definition

"As soon as this Act takes effect all coffee introduced into Puerto Rico shall pay a duty of fifteen (15) cents a pound for raw coffee and eighteen (18) cents a pound if roasted or ground coffee, said duty to be collected by the Federal Customhouse Service established in Puerto Rico, under such regulations as it may promulgate therefor; *Provided*, That when market conditions may warrant it and for the purpose of protecting the consumer or the coffee industry, the Secretary of Agriculture and Commerce is hereby authorized, until June 30, 1958, to increase or reduce the duty levied by sections 2201–2205 of this title, after a public hearing to that effect. The reduction or increase determined by the Secretary of Agriculture and Commerce shall be subject to the approval of the Governor. Every resolution increasing or reducing the duty levied shall be accompanied by a statement concerning the considerations borne in mind for making the change; *Provided*, That the phrase 'introduced into Puerto Rico', as used in sections 2201–2205 of this title, shall mean the importation into Puerto Rico of coffee from any foreign country, as well as coffee brought into Puerto Rico from any state, territory, district or possession of the United States or any other place under the jurisdiction of the United States; *Provided*, That the word coffee as used in sections 2201–2205 of this title shall comprise raw, roasted, or ground coffee, or coffee prepared in any form; it being understood that in the case of the introduction into Puerto Rico of coffee preparations in any form other than raw, roasted, or ground coffee, the duty shall be computed on the basis of its equiva-

lence in raw coffee, as provided in sections 2201–2205 of this title."

On April 17, 1957, pursuant to public notice, the Secretary of Agriculture and Commerce, acting under the power granted to him in Act No. 95, supra, held a public hearing on the question of increasing the rates of duty on coffee imported into Puerto Rico. On the following day, by Resolution, dated April 18, 1957, signed by the Secretary of Agriculture and Commerce and approved by the Governor of Puerto Rico, the Secretary declared effective an increase in the rates of duty on roasted and green coffee imported for use, consumption, and sale in Puerto Rico. The import duty on roasted coffee was increased from 18 cents per pound to 36 cents per pound and on green coffee from 15 cents per pound to 30 cents per pound.

The coffee covered by the protests in these cases is roasted coffee, which had been ordered from New York by plaintiffs on January 9 and March 19, 1957. The merchandise arrived in Puerto Rico on April 19, 1957, in three of the consolidated cases, and, in the fourth case, the merchandise reached Puerto Rico on April 9, 1957. It was entered on April 22, 1957, and on May 1, 1957, respectively.

The collector of customs assessed duties on this coffee at the rate of 36 cents per pound, in accordance with the Resolution of the Secretary of Agriculture and Commerce mentioned above.

Plaintiffs protested the assessment of the increased duties on the ground that, under the circumstances of these cases, such an assessment amounted to a retroactive application of the rates proclaimed in the Resolution. They claimed that the entries covering the merchandise should have been liquidated on the basis of the rate specified in the statute (Act No. 95) i. e., 18 cents per pound. The relief sought was a refund of the difference between the duties based on the rate of 18 cents per pound and 36 cents per pound.

Plaintiffs later amended their protests to attack the validity of the action of the

Secretary of Agriculture and Commerce in increasing the tariff duties and to question the constitutionality of the involved statutes. The amendments to the protests do not contain a prayer or specific claim for further or different relief from that requested in the protests as originally filed.

We think the points specifically urged in the amendments to the protests may be summarized as follows:

1. That 19 U.S.C.A. § 1319, authorizing the Legislature of Puerto Rico to impose tariff duties on imported coffee is an unlawful delegation by Congress of its power to make the law and is, therefore, unconstitutional, and that Act No. 95, supra, passed under the authority thereof, is illegal and void.

2. That Act No. 95, supra, inasmuch as it assumes to delegate to the Secretary of Agriculture and Commerce the power to fix tariff duties on imported coffee, is an unlawful delegation of the taxing power of the Legislature of Puerto Rico and is invalid.

3. That the increase in rates of duty on imported coffee, proclaimed in the Resolution of April 18, 1957, constituted an administrative ruling within the contemplation of 19 U.S.C.A. § 1315(d) (section 315(d), Tariff Act of 1930), and a failure to publish the ruling, as required by that statute, rendered invalid the assessment of the increased duties.

The first issue presented is the validity of section 1319, supra. In 1930, when section 1319 was enacted into law, Puerto Rico was a Territory of the United States. The United States had supreme sovereignty over it, and Congress had full and complete legislative authority over its people and Government. Late Corporation of the Church of Jesus Christ of Latter-Day Saints v. United States, 136 U.S. 1, 10 S.Ct. 792, 34 L.Ed. 478.

The authority of Congress to govern territories is derived from the Constitution of the United States, Article IV, Section 3, clause 2, which gives to that body the power to "make all needful Rules and Regulations respecting the Territory * * * belonging to the United States." In the exercise of its power to govern the territories, Congress is not subject to the same restrictions imposed upon it in legislating for the United States considered as a political body of states in union. Dorr v. United States, 195 U.S. 138, 140, 142, 24 S.Ct. 808, 49 L.Ed. 128; Balzac v. People of Porto Rico, 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627. It may legislate directly or delegate its general powers of legislation on subjects affecting the people of a territory to a legislature elected by its citizens. Binns v. United States, 194 U.S. 486, 24 S.Ct. 816, 48 L.Ed. 1087. Since Puerto Rico, at the time of the passage of section 1319, supra, was an organized Territory with a legislature elected by the local citizens, Congress had the right to confer upon that legislative body the power to impose tariff duties on coffee imported into Puerto Rico.

Plaintiffs contend that the imposition of such duties was not a local matter. It was certainly a matter that affected the people of the Territory. Section 1319, supra, was apparently enacted because it was thought that certain local conditions could be remedied, to some extent at least by imposing duties on coffee imported into Puerto Rico. The first law passed by the Legislature of the Territory, pursuant to the authority granted by the statute under attack, was enacted for the express purpose of protecting the coffee industry of Puerto Rico. See Porto Rico Brokerage Co., Inc. v. United States, 76 F.2d 605, 23 C.C.P.A. 16; T.D. 47672. Clearly, the matter of the protection of an industry so important to the economy of Puerto Rico was a matter of local concern. In addition, the duties so assessed and collected were to be paid into the Treasury of the Territory and expended by the local Government for its benefit.

That Congress could lawfully authorize the Legislature of Puerto Rico to do the very thing that plaintiffs here contend it could not do, appears to have been

recognized by the Supreme Court of the United States in the case of Dooley v. United States, 183 U.S. 151, 22 S.Ct. 62, 64, 46 L.Ed. 128, when it said, in the course of its decision, "now, there can be no doubt whatever that if the legislative assembly of Porto Rico should, with the consent of Congress, lay a tax upon goods arriving from ports of the United States, such tax, if legally imposed, would be a duty upon imports to Porto Rico." See also United States v. Heinszen, 206 U.S. 370, 27 S.Ct. 742, 746, 51 L.Ed. 1098. The Court there said that "Congress, in dealing with the Philippine Islands, may * * * delegate legislative authority to such agencies as it may select." In fact, by the Act of August 29, 1916, ch. 416, 39 Stat. 548, 48 U.S.C. § 1042, Congress authorized the territorial Government of the Philippines to enact tariff laws. We think it is clear that Congress could lawfully delegate to the Legislature of Puerto Rico the power to impose tariff duties on coffee imported into Puerto Rico.

At the present time, Puerto Rico occupies, and it has occupied, since 1952, the status of a self-governing Commonwealth as the result of a compact entered into with the United States. Public Law 447, 66 Stat. 327, 48 U.S.C.A. § 731d note.

Plaintiffs do not contend that section 1319 is inapplicable to Puerto Rico because of its change in status from a territory of the United States to that of a Commonwealth, and we do not feel that such change has in any way altered the applicability of the foregoing legal principles. Suffice it to say that in accordance with the compact all Federal laws not locally inapplicable are to have the same force and effect in Puerto Rico as in the United States. It can hardly be said that section 1319 is not locally applicable, since it was especially designed to apply to Puerto Rico, and is consistent with the guaranty of full sovereignty over local matters.

Nor do we find warrant for the contention that the statute must be struck down because it lacked a declaration of policy and failed to prescribe standards to guide the Legislature of Puerto Rico in the exercise of the delegated power.

The case of Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446, relied on by plaintiffs, involved a delegation to the President of the United States, under section 9(c) of the National Industrial Recovery Act, 48 Stat. 195, of power to prohibit the transportation in interstate commerce of petroleum produced or withdrawn from storage in excess of the amount permitted by any State law. A penalty was prescribed for violation of orders issued thereunder. The Supreme Court struck the statute down as an unconstitutional delegation of legislative power, because Congress had failed to declare its policy or prescribe standards to govern the President's course.

Section 1319 of U.S.C.A. does not involve a delegation of legislative power to an executive, administrative, or judicial officer or administrative body. The recipient in this instance was a legislative body. Consequently, the doctrine of separation of powers is not involved in section 1319 as was the case in Panama Refining Co., supra.

We shall now turn our attention to the question of the delegation of power to the Secretary of Agriculture and Commerce to alter tariff rates on coffee contained in Act No. 95, supra, and determine whether or not that delegation was a lawful one.

Plaintiffs contend that the authority granted to the Secretary to increase or reduce the duties which had been fixed by the Legislature of Puerto Rico on the imported coffee was a delegation of the taxing power of that body and was invalid. They further contend that, in the absence of express authorization, the Legislature did not have the authority to subdelegate the power to the Secretary.

■ Where the doctrine of separation of powers applies, it is a cardinal principle that a legislative body cannot transfer to executive or administrative officers

or agencies its power to make the law. A legislature may use, however, executive officers in the application and enforcement of policies and objectives declared in law. Under this rule, delegations by the Congress of the United States to the President of the power to alter tariff rates on imported merchandise in execution of an expressed congressional policy have been sustained. See Hampton, Jr., & Co. v. United States, 276 U.S. 394, 48 S.Ct. 348, 352, 72 L.Ed. 624. The Supreme Court said, in that case, 276 U.S. at page 409, 48 S.Ct. at page 352, "If Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to fix such rates is directed to conform, such legislative action is not a forbidden delegation of legislative power."

There would appear to be no ground for denying a similar power of delegation by the Legislature of Puerto Rico to an executive officer of that Government. Before Puerto Rico assumed the status of a Commonwealth in 1952, all of the powers exercised by its Legislature were delegated to it by the Congress, and delegations to administrative officers of discretionary authority in the execution of such delegated powers have been sustained. See Gallardo v. Porto Rico, 1 Cir., 18 F.2d 918.

If the court is to uphold the grant of authority contained in Act No. 95, supra, as a lawful delegation of power to the Secretary, it will have to find that the Legislature has not vested in that official an unbridled discretion to fix rates of duty on imported coffee, but has declared its legislative policy in the delegating statute and prescribed therein standards sufficient to guide the Secretary in the exercise of the power granted. The degree to which the policies and standards must be specified in order that the delegation is not one of the power to make the law cannot be precisely defined in all cases. Lichter v. United States, 334 U.S. 742, 68 S.Ct. 1294, 92 L.Ed. 1694. In determining the validity of the grant of authority, the court is not restricted solely to a con-

sideration of the language of the delegation. It may consider "the purposes of the whole Act, the natural and necessary limitations for administrative action, and the boundaries which historically have been attached to and enforced in the exercise of such power." Alaska Steamship Co. v. Mullaney, 9 Cir., 180 F.2d 805, 821.

However, we shall first direct our attention to the text of the delegation. It reads as follows:

"* * * *Provided*, That when market conditions may warrant it and for the purpose of protecting the consumer or the coffee industry, the Secretary of Agriculture and Commerce is hereby authorized, until June 30, 1958, to increase or reduce the duty levied * * * after a public hearing to that effect. The reduction or increase determined by the Secretary of Agriculture and Commerce shall be subject to the approval of the Governor. Every resolution increasing or reducing the duty levied shall be accompanied by a statement concerning the considerations borne in mind for making the change; * * * *"

The policy or purpose of the Legislature as revealed by the statute is to protect the consumer or the coffee industry. To carry out this purpose, the Secretary of Agriculture and Commerce is empowered "when market conditions may warrant it" to increase or reduce without stated limit, the duties levied by the Act on coffee imported into Puerto Rico until the termination date set forth in the statute. The Act contains no definition of circumstances or conditions which would call for the exercise of the delegated power by the Secretary to protect the consumer or the coffee industry. No standard is provided to aid him in determining when market conditions may warrant action. There is no standard to which the Secretary must conform in his determination of the rates to be imposed under the tariff-fixing power. The broadly stated policy or purpose and the generally stated market conditions to be

determined are the only guides to the Secretary prescribed in Act No. 95, supra.

Counsel for the defendant defend the adequacy of these guides. They cite numerous cases in which they claim the courts have upheld statutes of delegation in which the standards prescribed to guide administrative action were much less definite and precise than those established for the guidance of the Secretary in the Act under consideration.

One of these cases is New York Central Securities Corporation v. United States, 287 U.S. 12, 53 S.Ct. 45, 77 L.Ed. 138, in which the criterion to be applied by the Interstate Commerce Commission in the exercise of the delegated powers was the "public interest." With regard to that criterion, the Supreme Court said, 287 U.S. at pages 24, 25, 53 S.Ct. at page 48: "It is a mistaken assumption that this is a mere general reference to public welfare without any standard to guide determinations. The purpose of the Act, the requirements it imposes, and the context of the provision in question show the contrary * * * the term 'public interest' as thus used is not a concept without ascertainable criteria, but has direct relation to adequacy of transportation service, to its essential conditions of economy and efficiency, and to appropriate provision and best use of transportation facilities, questions to which the Interstate Commerce Commission has constantly addressed itself in the exercise of the authority conferred. So far as constitutional delegation of authority is concerned, the question is not essentially different from that which is raised by provisions with respect to reasonableness of rates, to discrimination, and to the issue of certificates of public convenience and necessity."

It seems to be the position of counsel for defendant that the purposes of protecting a domestic industry or the consumer when employed in tariff legislation do not raise vague and uncrystallized concepts; but, like the term "public interest" in the case of New York Central Securities Corp., supra, are concepts with ascertainable criteria, and well-defined meanings which criteria and meanings have developed as the result of years of tariff legislation and administration, and may be read into Act No. 95, supra, to serve as guides for the Secretary in the exercise of the power delegated therein. We find nothing in the cited case to support this theory. As we read the decision in that case, the term "public interest" was given content and meaning by the general purpose and by other sections of the statute in which it was used. Resort was not had for this purpose to sources outside of the Act.

Even if it be conceded that such criteria can be read into the statute to clarify and give meaning to the broadly stated legislative policies so that no further delineation of the circumstances from which the consumer and the coffee industry are to be protected by the exercise of the power granted for that purpose is required, such criteria could only serve to guide the administrative determination of the occasion for the exercise of the tariff-fixing power. As we have pointed out, there is a complete absence of standards in the statute to aid the Secretary in the determination of the particular rates to be imposed. Under the terms of the delegation, the discretion of the Secretary in this respect is unbridled and uncontrolled. He is free to increase or reduce duties to any level that his judgment dictates. No predetermined or other limits are placed upon this power.

It is true that the statute makes the increase or reduction determined by the Secretary of Agriculture and Commerce subject to the approval of the Governor. Such a requirement may serve as some check on the use of the power delegated in the Act, but it can neither cure defective and inadequate legislative standards and controls, nor supply nonexistent ones. In truth, the absence of a standard to control or delimit the rate-fixing authority delegated in Act No. 95, supra, places a discretion in the Secretary and the Governor as unfettered as that of

the Legislature itself in fixing tariff duties on imported coffee for the purposes set forth in the statute.

Such an unlimited and unfettered delegation of power as is contained in Act No. 95, supra, finds no support in the other decisions upon which the defendant relies.

It is true Hampton, Jr., & Co. v. United States, supra, involved, like the instant cases, a delegation of power to fix customs duties. The statute involved in the cited case empowered and directed the President of the United States to increase or reduce duties, so as to equalize differences in costs of production of domestic and like or similar foreign articles, when, upon investigation of such differences, he found that the duties fixed in the Act did not equalize the same. In no event could the increase or reduction exceed 50 per centum of the specified rates in the statute. Unlike Act No. 95, supra, section 315(a) of title III of the Tariff Act of 1922, 42 Stat. 941, not only prescribed a standard to guide the President in the exercise of the authority to alter tariff duties (the equalization of differences in ascertained costs of production), but, in addition, it imposed predetermined limitations on the exercise of the power. Though the Act gave to the President a fairly wide latitude of discretion in ascertaining and finding differences in production costs, there was no delegation of unlimited and unfettered discretion in altering the rates of duty once such facts had been determined. Clearly, the cited case lends no support to the claim of validity made for the delegation of power in Act No. 95, supra.

In the case of Field v. Clark, 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294, no authority was delegated to the President to alter specified tariff duties. The duties were fixed by the statute involved, the Tariff Act of 1890, 26 Stat. 567, and the President was simply empowered to find and declare the existence of the event upon which Congress had decreed the rates were to become effective.

Nor do we think that counsel for defendant can find support for their position in the cases of Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834, and Bowles v. Willingham, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892, both of which they have cited. The first case involved a delegation of power to fix maximum prices under the wartime Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix, § 901 et seq. Standards were prescribed in the Act to guide the administrative determination of the occasion for the exercise of the price-fixing power and the determination of the *particular prices to be established.* The Act directed that the prices fixed should be fair and equitable, that they should tend to promote the purposes of the Act, and that, in fixing them, consideration so far as practicable should be given to prices prevailing in a stated base period.

Bowles v. Willingham involved a grant of power under the same Act. Authority was granted to the Price Administrator to fix maximum rents. As in the Yakus case, supra, the Administrator was not left with the general standard that the rents established should be those that, in his judgment, would be fair and equitable and would effectuate the purposes of the Act. The statute provided further criteria by directing that, in establishing any maximum rents, the Administrator should give consideration so far as practicable to rents in effect on a specified date. The Act provided that, in no event, could the Administrator ascertain and give consideration to rents prevailing prior to a stated date. Congress did not tell the Administrator to fix rents at whatever level he pleased.

It would unduly prolong this opinion were we to comment on all of the cases cited by counsel for the defendant. Suffice it to say that in none of them, including the cases above, do we find any authority or support for the grant of unlimited power contained in Act No. 95, supra. On the contrary, they serve to point up the apparent failure of the Legislature of Puerto Rico to limit the

grant of authority to the Secretary by appropriate standards.

Acts of Congress of the United States in which powers of a similar nature have been delegated demonstrate the inadequacy of the standards in Act No. 95, supra. 19 U.S.C.A. § 1336, authorizes the President to proclaim changes in tariff duties which the Tariff Commission, upon investigation, shall find necessary to equalize differences in costs of production between foreign and domestic articles. It retains the 50 per centum limitation of the corresponding section in the Tariff Act of 1922. The power granted the President to modify duties under the Reciprocal Trade Agreements Act of 1934 (section 350(a) of the Tariff Act of 1930, 19 U.S.C.A. § 1351(a)) is similarly limited.

This pattern of imposing predetermined limits appears to be consistent throughout existing as well as previous congressional legislation affecting imports, whether it concerns tariff duties or the imposition of fees, in addition to such duties, where the power to alter the duties or impose fees is delegated to an executive officer of the Government. 7 U.S.C.A. § 624(b), authorizes the President, upon stated conditions, to impose fees on imported agricultural commodities. In addition to other prescribed standards, it imposes a limitation of 50 per centum of the ad valorem rate on the exercise of the power.

The Acts of Congress to which we have adverted demonstrate the boundaries which have been attached to the exercise of the delegation of power to alter tariff rates. It is manifest that the delegation to the Secretary goes beyond these boundaries. The discretion of the Secretary in determining the rates to be proclaimed was unconfined, having no ascertainable limits. It is our opinion that Act No. 95, supra, unlawfully delegates legislative power to the Secretary of Agriculture and Commerce.

■ The statutes of the Commonwealth of Puerto Rico are not to be declared invalid on shadowy or tenuous grounds. However, in exercising a pow-er conferred upon it by Congress, the Legislature of Puerto Rico is subject to the same restrictions upon the delegation of legislative authority as rest upon the Congress. Where it clearly appears that it has failed to observe these restrictions and that it has exceeded the limits of permissible delegation, this court, in the exercise of its judicial function, must so declare.

■ We, therefore, find that the proviso in Act No. 95, supra, which delegates to the Secretary of Agriculture and Commerce of Puerto Rico the power to increase or reduce the duties levied by that Act is invalid as an unlawful delegation of legislative power. The infirmity is confined to that proviso alone, since it is unquestionably divisible from the rest of the Act. It is an elementary principle of law that if any part of an act, divisible from other provisions, should be found to be invalid, the other provisions will not be affected by such decision.

■ It follows that the Resolution of the Secretary of Agriculture and Commerce, dated April 18, 1957, and issued under the authority of the invalid proviso, is also invalid, and that the increased duties levied by virtue of its provisions on the involved coffee by the collector of customs at the port of San Juan, P. R., were unlawfully assessed.

■ The additional question that needs to be decided is whether recovery in three of the protests herein is barred, by virtue of the provisions of 13 L.P.R. A. § 261, which reads:

"* * * Provided, further, That no credit or reimbursement of any tax covered by sections 261 and 262 of this title shall be granted unless the taxpayer shows to the satisfaction of the Secretary of the Treasury that he has sustained the burden of the payment of the tax; * * *."

It was stipulated and agreed that, in three of the protests, the increased tariff duty was not absorbed by the importer, but was passed on to other cof-

fee roasters. It is contended that, in these cases, a refund of the increased duties, although illegally assessed, should not be refunded. The argument is made that since 31 Stat. 78, 48 U.S.C.A. § 740, provides for customs duties collected in Puerto Rico to be paid into the Treasury of the Commonwealth, after deduction of the costs of collection, an order of refund, in this case, would ultimately be directed against the Treasury of the Commonwealth, and that, by force of these circumstances, 13 L.P.R.A. § 261, is applicable. We think the answer to this contention is that section 261, supra, does not apply to the facts in this case and does not govern the reimbursement of customs duties.

In view of our disposition of the case, we deem it unnecessary to discuss other issues raised by counsel for the parties.

The protests are sustained and judgment in accordance with this opinion will be rendered in favor of the plaintiffs.