**IN re CONSOLIDATED UNITED STATES ATMOSPHERIC TESTING LITIGATION.**

**No. C–84–0022–WWS.**

United States District Court, N.D. California.

Aug. 28, 1985.

As Corrected Sept. 19, 1985.

Jeffrey L. Schaffer, Alan W. Sparer, Therese M. Stewart, Ethan P. Schulman, Howard, Rice, Nemerovski, Canady Robertson & Falk, Robert E. Aune, Carnes & Aune, Edward J. Nevin, San Francisco, Cal., Bruce A. Reynolds, Cupertino, Cal., James Geagan, Hoberg, Finger, Brown, Cox & Molligan, Thomas J. Brandi, Bianco, Brandi & Jones, San Francisco, Cal., Jacob M. Weisberg, Weisberg & Gordon, Fresno, Cal., for plaintiffs.

John A. Reding, Crosby, Heafey, Roach & May, Oakland, Cal., Jerome C. Dougherty, Pillsbury, Madison & Sutro, San Francisco, Cal., John L. Thorndal, Thorndal, Backus & Maupin, Ltd., Arthur L. Williams, Jr., Gen. Counsel, REECO, Las Vegas, Nev., Paul F. Figley, Jeffrey Axelrad, Leon B. Taranto, Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM OF OPINION AND ORDER

WILLIAM W SCHWARZER, District Judge.

Before the Court are forty-three consolidated actions asserting claims arising out of alleged exposure to nuclear radiation resulting from the bombing of Hiroshima or subsequent atmospheric testing of nuclear weapons. Most of the persons on whose behalf actions are brought were members of the military at the time of their alleged exposure.[1] Others participated in nuclear weapons tests as civilians.[2] Defendants are the United States government and contractors who participated in the nuclear weapons testing program.[3]

The government has moved pursuant to 42 U.S.C. § 2212, to be substituted for the contractors as defendant in these actions, and the contractors have joined in that motion.[4] In addition, the government has

1. Following are the actions brought by or on behalf of servicemen and the dates and locations of their radiation exposure:

| Action | Plaintiff | Test | Year |
|---|---|---|---|
| Japan Detonations | | | |
| 83–2989 84–3210 | Molsbergen | Nagasaki | 1945 |
| 84–2785 | Minarik | Hiroshima/Nagasaki | 1945 |
| 83–0309 83–1291 | Solano | Hiroshima/Nagasaki | 1945 |
| Pacific Detonations | | | |
| 82–1405 | Beaman | Crossroads | 1946 |
| 82–5902 83–0008 | Benson | Crossroads | 1946 |
| 82–6372 83–0009 | Carsillo | Crossroads | 1946 |
| 83–2248 | Collins | Crossroads | 1946 |
| 83–0308 83–1292 | Cordray | Crossroads | 1946 |
| 83–3061 | DeMuth | Crossroads | 1946 |
| 84–3259 | Erspamer | Crossroads | 1946 |
| 82–6494 83–1289 | Estes | Crossroads | 1946 |
| 83–0188 83–1290 | Ferguson | Crossroads | 1946 |
| 83–4848 84–0310 | Guarisco | Crossroads | 1946 |
| 83–4849 | Milne | Crossroads | 1946 |
| 83–4847 | Paskett | Crossroads | 1946 |
| 82–3115 | Saraiva | Crossroads | 1946 |
| 83–4496 | Van Winkle | Crossroads | 1946 |
| 82–5812 | Williams | Greenhouse | 1951 |
| 83–0945 83–5758 | Blake | Castle | 1953–54 |
| 83–4842 | Porambo | Castle | 1954 |
| 83–1391 83–3051 | Dixon | Redwing | 1956 |
| 83–4844 | Fassett | Dominic II | 1962 |
| Nevada Detonations | | | |
| 81–0734 | Konizeski | Ranger and/or Buster/Jangle | 1951 |
| 81–1511 | Sanders | Ranger and/or Buster/Jangle | 1951 |

| Action | Plaintiff | Test | Year |
|---|---|---|---|
| 82–4845 | Fond | Upshot Knothole | 1953 |
| 83–4841 83–5402 | Hoffmeister | Upshot Knothole | 1953 |

In addition, decedent Smith allegedly participated in the Ivy (1952), Castle (1954), and Hardtack I (1958) tests in the Pacific as a serviceman, and in the Dominic I test in the Pacific as a civilian. *Harrison v. United States*, 83–5307.

2. Following are the actions brought by or on behalf of civilian plaintiffs and the dates and locations:

| Action | Plaintiff | Test | Year |
|---|---|---|---|
| Pacific Detonations | | | |
| 84–2468 | Green | Greenhouse | 1951 |
| 82–3116 | Stephens | Castle | 1953–54 |
| 82–3114 | King | Castle | 1954 |
| | King | Wigwam | 1955 |
| | King | Hardtack I | 1958 |
| 85–2138 | Hinkle | Redwing | 1956 |
| Nevada Detonations | | | |
| 83–5642 | Ryder | Unknown | Unknown |

*See also Harrison v. United States*, 83–5307, cited in note 1 *supra*.

3. Contractors named as defendants include the University of California, American Telephone and Telegraph Company (including its affiliates Sandia Corporation, AT & T Technologies, Inc., and AT & T Bell Laboratories), and Reynolds Electrical and Engineering Co., Inc. (collectively "the contractors").

4. Plaintiff Ryder alleges in his complaint (83–5642) that his injuries were incurred while he was employed at the University of California before the University became a government contractor in the nuclear weapons testing program. That action, therefore, is not entirely subject to the substitution provisions of § 2212. Inasmuch as Ryder concedes that he received compensation for his injuries through Workers Compensation, it is difficult to see what if any claim he could now assert against the University. His action will be severed and Ryder shall have thirty days from the date of this order to

moved to dismiss or for summary judgment in all actions based on exceptions to its liability under the Federal Tort Claims Act, (the "FTCA"), 28 U.S.C. § 2680.

## I. *Factual Background*[5]

The atmospheric nuclear weapons tests giving rise to these actions took place between the closing days of World War II and the adoption of the Partial Nuclear Test Ban Treaty in 1963. Even before these tests, the United States Government had enlisted the scientific resources of industrial firms and universities in the program to develop an atomic bomb. The Manhattan Project, which ultimately produced the bomb detonated over Hiroshima, was an unprecedented joint effort by the government, universities and industry.

Immediately following the end of World War II, the military services proposed a series of tests to determine the effects of atomic weapons. On orders of the President, a joint military task force was established to conduct the first of these tests, Operation Crossroads, at Bikini Atoll. The task force, commanded by an admiral, comprised 42,000 military and civilian personnel and numerous ships and aircraft.

In 1946, Congress adopted the Atomic Energy Act, (the "AEA"), establishing a national policy for the development and control of nuclear weapons. Under the AEA, authority was transferred from the military to the Atomic Energy Commission, (the "AEC"), which was to operate a "program of federally conducted research and development" with the "paramount objective of assuring the common defense and security." AEA, P.L. No. 585, ch. 724, 60 Stat. 755, §§ 1(a), (b)(3) (current version at 42 U.S.C. § 2011 *et seq.*). To this end the AEC was authorized to conduct experiments, undertake research, and develop the military applications of atomic energy either in its own facilities or pursuant to arrangements with public or private institutions. *Id.* at § 4(c)(2). All right, title and interest in fissionable material was vested in it. *Id.* at §§ 4(b), 5(a)(2). The production of atomic bombs and bomb parts was authorized, but "only to the extent that the express consent and direction of the President of the United States has been obtained...." *Id.* at § 6(a)(2). In addition, Congressional oversight of the AEC's activities was established by creation of the Joint Committee on Atomic Energy. *Id.* at § 15(a). The AEA thus established a program of pervasive "[g]overnmental control of the production, ownership, and use of fissionable material," including the development and testing of nuclear weapons. *Id.* at § 1(b)(4).

When the AEC took over the nuclear weapons program from the military, it acquired a complex of plants, laboratories and other facilities staffed by some 2,000 military personnel, 4,000 civilian government employees and 38,000 employees of contractors. The integral role of contractors, which started in the Manhattan Project, continued under the AEC. The University of California, Sandia Corporation and Reynolds Electrical and Engineering Co., Inc., were among those contractors.

Escalating international tensions, marked by the Berlin blockade in 1948, the confrontation with the Soviet Union over Czechoslovakia, Greece and Iran, the detonation by the Soviet Union of an atomic device in 1949, and the Korean War led the government to assign the highest priority to the development and production of nuclear weapons. Weapons tests were an essential part of that effort.

These tests were regarded as critical to national security. Presidents Eisenhower and Kennedy and the Chairman of the AEC made public statements stressing the vital importance of tests to the development of

---

submit and serve declarations and documents containing facts to support his claim. The Court will then determine whether the action survives the summary judgment motion.

**5.** *See generally* the government's and plaintiffs' statements of facts in support of their motions and referenced exhibits. The facts material to the disposition of these motions are not in dispute.

modern weapons needed to assure national security in the face of the threat posed by the Soviet Union. Indeed, atmospheric nuclear weapons testing was a major issue in United States-Soviet relations during this period. Beginning in 1955, testing was a topic in the disarmament negotiations. In 1958, a moratorium on tests was agreed on and was observed until the Soviet Union resumed atmospheric testing in 1961. The United States followed suit to counteract qualitative improvements in Soviet weapons. In 1963, atmospheric nuclear tests were finally banned by the Partial Nuclear Test Ban Treaty.

From 1947 through 1963, the AEC in conjunction with the Department of Defense conducted 21 test series, some of which are the subject of these actions. These tests had a number of objectives, including developing weapons, planning their tactical and strategic use, determining how targets could be given protection, assessing the vulnerability of troops to the effects of detonations, and improving radiological safety. A particular objective of the tests was to determine the effects of nuclear explosions on the equipment, clothing, weapons and fighting capability of military personnel. The tests were coordinated with studies conducted at laboratories operated by contractors.

Every phase of the preparation and implementation of each nuclear weapons test series was closely controlled and supervised by government officials. Initially, proposals for tests had to be approved at various levels by the responsible divisions of the AEC and the Department of Defense. Before any test took place, a detailed Operation Plan had to be reviewed and approved by the AEC, by the National Security Council, and finally by the President.

Tests at the Pacific Proving Ground were under the control of a joint task force commander, appointed by the AEC and the Joint Chiefs of Staff. At the Nevada Test Site, tests were under the control of a Test Manager designated by the AEC. Tests were conducted in conformity with the approved Operation Plan, which incorporated radiation exposure limits established by the AEC applicable to both military and civilian personnel. Various military and civilian committees and medical and scientific experts took part in making the decisions which were incorporated into the Operation Plan. Designated units in each test organization were assigned responsibility for radiological safety.

Nuclear weapons testing was known to be an inherently dangerous activity. Aside from the recognized radiation hazards, the risks included the dangers associated with any explosive devices, the effects of unpredictable meteorological conditions, and the risks of injury inherent in any large-scale military operation.

The need to balance risks against test objectives was particularly acute in tests involving troop maneuvers. These tests were intended to expose troops to battlefield conditions to test psychological reactions and protective measures. The location and movement of those troops was a subject of controversy between the AEC and military commanders. It was recognized that the desire of the military to expose troops to realistic combat conditions could interfere with the AEC's weapons testing objectives. The arrangements ultimately incorporated in the Operation Plans represented an accommodation of these divergent requirements by the AEC and military officials. In later tests, involving large scale military maneuvers under battlefield conditions, these considerations led to delegation of responsibility for radiological and physical safety of troops to the military commanders.

## II. *Motions to Substitute*

### A. *The Provisions and Effect of § 2212*

In October 1984, Congress adopted § 1631 of the Department of Energy National Security and Military Applications of Nuclear Energy Authorization Act of 1985, (the "Act"), codified at 42 U.S.C. § 2212. It provides that an action against the United States shall be the exclusive remedy for

injuries "due to exposure to radiation based on acts or omissions by a contractor in carrying out an atomic weapons testing program under a contract with the United States," § 2212(a)(1), and requires any action against these contractors to be maintained solely against the United States pursuant to the FTCA. The Act applies to alleged acts or omissions of contractors "without regard to when the act or omission occurred." § 2212(a)(2).

The Act provides, in pertinent part, that: A contractor against whom a civil action or proceeding described in subsection (a) ... is brought shall promptly deliver all processes served upon that contractor to the Attorney General of the United States. *Upon certification by the Attorney General* that the suit against the contractor is within the provisions of subsection (a) ..., a civil action or proceeding commenced in a State court shall be removed without bond at any time before trial by the Attorney General to the district court of the United States for the district and division embracing the place wherein it is pending and *the proceedings shall be deemed a tort action brought against the United States....* For purposes of removal, the certification by the Attorney General under this subsection establishes contractor status conclusively.

42 U.S.C. § 2212(b) (emphasis added).

A "contractor" is defined as "a contractor or cost reimbursement subcontractor of any tier participating in the conduct of the United States atomic weapons testing program...." § 2212(d). Authority to certify pursuant to § 2212(b) that the action against the contractor "is based on acts or omissions by a contractor in carrying out an atomic weapons testing program under a contract with the United States" rests with the Attorney General. § 2212(a)(1).

In its statement supporting the Act, the Department of Justice explained the unique situation at which it is aimed:

[The Act] would clarify the status of certain contractors operating government-owned facilities relating to atomic energy national defense activities in litigation arising from those activities. Many actions recently have been brought against these contractors who have invaluably assisted the Government of the United States in carrying out its nuclear weapons testing program. The actions allege exposure to radiation and consequent injury or death as a result of the United States atomic weapons testing.

The provisions of the Federal Tort Claims Act determine the rights of individuals and corporate litigants to seek monetary recovery from the United States for alleged torts. Typically, the United States cannot be sued for and is not liable for the acts of independent contractors providing goods or services to the United States. However, contractors who operate nuclear weapons testing facilities for the Department of Energy or its predecessor agencies and who, as a result, have participated in the atomic weapons testing program are unique. They are not typical contract suppliers of commercially provided goods or services to the government. These contractors were and are utilized by the United States as instruments of national policy to assist in an entirely governmental task—nuclear weapons research, development and testing. Further, the government reimburses these contractors for any liability arising out of their assistance in the weapons program, including the costs of litigation. The use of the contractors to implement national policy and perform a uniquely governmental function cannot be disputed. Therefore, it should be perfectly clear that, for the purposes of civil litigation arising from atomic weapons testing, the proper party defendant is the government. Only the government sets policy, makes decisions, and controls activities and circumstances regarding atomic weapons testing.

H.R.Rep. No. 124, Part I, 98th Cong., 1st Sess. 34–35 (1983).

The report of the Senate Committee on Armed Services elaborates the Act's underlying rationale:

Each nuclear test that has been made since 1946 has been made under the statutory direction of Congress. Each nuclear test has been approved, before the fact, by the President of the United States. Each nuclear test has been under the direct supervision of government officials. Each nuclear test has been participated in by hundreds, and in some cases thousands, of government officials and military and civilian personnel.

The committee recognizes, as has the Congress, that the military applications of atomic energy could not proceed either technically or economically without the participation of organizations that possess both scientific management skills and a high degree of scientific and technical expertise. Several such organizations were placed under contract almost at the inception of the nuclear weapons program in 1942 and have performed in an outstanding manner in the national interest for more than three decades. These organizations have provided scientific, engineering and technical support for nuclear tests carried out by the government and for the government in the exercise of a governmental function, i.e., providing for the national defense. These organizations did not order the tests to be performed; they did not set the times or places for the tests; nor did they direct military or civilian government personnel to participate in them.

S.Rep. No. 500, 98th Cong., 2d Sess. 376 (1984).

The Senate Report described the effect of the legislation as follows:

> [The Act] would cause all litigation involving the atomic weapons testing program, including suits now filed against contractors, to be maintained against the United States under the substantive and procedural requirements of the FTCA.

*Id.* at 375. By its terms, however, the Act is specifically limited to claims

> for injury, loss of property, personal injury, or death due to exposure to radiation based on acts or omissions by a contractor in carrying out an atomic weapons

testing program under a contract with the United States.

42 U.S.C. § 2212(a)(1).

The instant actions (with the exception of Ryder's) qualify under the Act. The Attorney General has made the statutory certification. The defendants' motions to substitute the United States as the sole defendant in these actions must be granted unless § 2212 is found to be invalid.

■ Plaintiffs contend that the Act should be read as authorizing only the addition of the United States as a codefendant, not the dismissal of the contractors. They rely on a statement in the Senate report suggesting such an interpretation of an earlier version of the bill:

> Without the consolidation of these many cases under the leadership of the Department of Justice, with the United States as a *codefendant*, a variety of judgments are possible based on the provisions of a different state [sic] laws and on the verdicts of juries in various state and federal courts.

S.Rep. No. 500, 98th Cong., 2d Sess. 377 (1984) (emphasis added).

The specific language of the Act as finally adopted, however, precludes such an interpretation by making the FTCA remedy "exclusive of any other civil action or proceeding," providing that employees of the contractors "shall be considered employees of the Federal Government," and directing that actions shall proceed in the same manner as any FTCA action against the United States. The Federal Drivers Act, making its remedies "exclusive of any other civil action ... against the employee," was held to abrogate common law actions against those employees for claims covered by the act. *See Carr v. United States*, 422 F.2d 1007, 1010 (4th Cir.1970). Congress must be presumed to have been aware of the effect given the statutory language in prior court decisions and to have intended to achieve the same effect.

### B. *The Validity of § 2212*

The effect of § 2212 is to substitute the remedy against the government under the

FTCA for any cause of action against the contractors arising under state law. In adopting this legislation, Congress broke no new ground. In a number of other acts, Congress substituted the FTCA remedy against the government for remedies available against private parties, and these acts have been uniformly upheld. *See Ducharme v. Merill-National Laboratories,* 574 F.2d 1307 (5th Cir.), *cert. denied,* 439 U.S. 1002, 99 S.Ct. 612, 58 L.Ed.2d 677 (1978) (Swine Flu Act); *Carr v. United States,* 422 F.2d 1007 (4th Cir.1970) (Federal Drivers Act). *See also* 42 U.S.C. § 233 (Public Health Service medical personnel); 38 U.S.C. § 4116 (Veterans Administration medical personnel); 22 U.S.C. § 817(a) (State Department medical personnel); 10 U.S.C. § 1089(a) (Armed Forces medical personnel).

The effect of all of those acts has been to foreclose trial by jury and to subject plaintiffs' claims to the defenses available to the government, such as the discretionary function exception and the *Feres* doctrine, *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950). It is too late in the day, therefore, to challenge the Act on the ground that it curtails the scope of the available remedy and in some cases has the effect of barring it altogether.

Moreover, these consolidated actions present perhaps the most compelling case for substituting the government as the sole defendant. The Act applies only to activities conducted under the closest control of the government, undertaken on authority from the President, capable of being performed solely by the government and inextricably interwoven with national security. Thus, to the extent due process requires demonstration of a rational basis for legislation controlling claims arising out of these activities, that requirement is amply met. *See Duke Power Co. v. Carolina*

*Environmental Study Group, Inc.,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978) (upholding Price-Anderson Act limitation on liability of government licensees for nuclear incidents against substantive due process challenge).

A question as to the validity of the Act arises solely because it applies to pending actions. It thereby raises issues under the Fifth Amendment and under the separation of powers doctrine.[6]

### 1. *Fifth Amendment Issues*

■ A cause of action has been described as "a species of property protected by the Fourteenth Amendment's Due Process Clause." *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 428, 102 S.Ct. 1148, 1154, 71 L.Ed.2d 265 (1982) (quoting *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950)). *See also In re Aircrash in Bali, Indonesia on April 22, 1974,* 684 F.2d 1301, 1312 (9th Cir.1982) (dictum).[7] To say that a cause of action is a species of protected property, however, is not to answer the question of what process is due. A cause of action is property of a substantially different nature than real or personal property or vested intangible rights. It is inchoate and affords no definable or enforceable property right until reduced to final judgment. *Cf. Armstrong v. United States,* 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960) (state law materialman's lien entitling supplier to resort to specific property to satisfy claims is a property right compensable under fifth amendment); *Lynch v. United States,* 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934) (contract rights are property rights compensable under fifth amendment).

A cause of action does not afford the holder the traditional bundle of rights asso-

---

6. Plaintiffs also argue that the Act violates their Seventh Amendment right to a jury trial. That argument is foreclosed, however, by the Court's conclusion, discussed *infra,* that the retroactive application of preclusive defenses is not barred by the Constitution.

7. In *Bali,* the court of appeals in dictum postulated that wrongful death claims are property within the meaning of the just compensation clause. The court, however, reserved the question whether the Warsaw Convention, limiting the amount recoverable in a wrongful death action, constituted a compensable taking.

ciated with the ownership of property. *Cf. United States v. Security Industrial Bank,* 459 U.S. 70, 75–76, 103 S.Ct. 407, 410–11, 74 L.Ed.2d 235 (1982). Instead, it represents a right to assert a claim for compensation or some other form of judicial relief. Its value is contingent on successful prosecution to judgment. Thus, to the extent it is entitled to due process protection, that protection focuses on assuring access to fair procedures for its prosecution. The notion of due process relevant to causes of action is that "deprivation ... by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950).[8]

That a cause of action may consistent with due process be impaired or lost before final judgment by events extraneous to the litigation is beyond question. In the leading case of *In re Schooner Peggy,* 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1801), Chief Justice Marshall said:

[I]f, subsequent to the judgment, and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied. If the law be constitutional ... I know of no court which can contest its obligation. It is true, that in mere private cases between individuals, a court will and ought to struggle hard against a construction which will, by a retrospective operation, affect the rights of parties, *but in great national concerns ... the court must decide according to existing laws,* and if it be necessary to set aside a judgment, rightful when rendered, but which cannot be affirmed, but in violation of law, the judgment must be set aside.

*Id.* 5 U.S. at 109–10 (emphasis added). In *Duke Power Co., supra,* the Supreme

Court summarized the applicable principles as follows:

Our cases have clearly established that "[a] person has no property, no vested interest, in any rule of the common law." *Second Employers' Liability Cases,* 223 U.S. 1, 50 [32 S.Ct. 169, 175, 56 L.Ed. 327] (1912), quoting *Munn v. Illinois,* 94 U.S. [ (4 Otto) ] 113, 134 [24 L.Ed. 77] (1877). The "Constitution does not forbid the creation of new rights, or the abolition of old ones recognized by the common law, to attain a permissible legislative object," *Silver v. Silver,* 280 U.S. 117, 122 [50 S.Ct. 57, 58, 74 L.Ed. 221] (1929), despite the fact that "otherwise settled expectations" may be upset thereby. *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 16 [96 S.Ct. 2882, 2892, 49 L.Ed.2d 752] (1976).

438 U.S. at 88 n. 32, 98 S.Ct. at 2638 n. 32.

The Supreme Court has noted a distinction between judicial decisions, which operate retrospectively, and statutes, which normally operate prospectively. *United States v. Security Industrial Bank,* 459 U.S. at 79, 103 S.Ct. at 412. But in that case the Court found only a rule of construction favoring prospective application of statutes. It found no general bar against retrospective application of statutes, and statutes have in fact been retroactively applied repeatedly. *See Dickinson Industrial Site, Inc. v. Cowan,* 309 U.S. 382, 388, 60 S.Ct. 595, 599, 84 L.Ed. 819 (1940) (retroactive application of bankruptcy rule to pending case); *Carpenter v. Wabash Railway Co.,* 309 U.S. 23, 60 S.Ct. 416, 84 L.Ed. 558 (1940) (retroactive application of provision giving personal injury judgment priority over mortgage lien); *Keller v. Dravo Corp.,* 441 F.2d 1239 (5th Cir.1971), *cert. denied,* 404 U.S. 1017, 92 S.Ct. 679, 30 L.Ed.2d 665 (1972) (retroactive application of limitation in Longshoremen's

---

**8.** Procedural due process does not, however, extend to the adoption of the Act itself, as plaintiffs argue. *Bi-Metallic Investment Co. v. Board of Equalization of Colorado,* 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915); *Minnesota State*

*Board for Community Colleges v. Knight,* 465 U.S. 271, 104 S.Ct. 1058, 79 L.Ed.2d 299 (1984). The requirements of procedural due process are satisfied by the proceedings in this Court on plaintiffs' claims.

and Harbor Workers Act on actions against employers).[9]

The record here demonstrates that Congress sought to deal with important national concerns raised by the proliferation of claims arising out of the nuclear weapons testing program: that negative public perception of the contractors' role in the program might jeopardize their continued participation; that actions against contractors threatened to disrupt the nuclear weapons program; and that the government was the proper party to defend claims arising out of purely governmental activities. *See generally* S.Rep. 500, *supra* at 375–77, H.R.Rep. No. 124 Part I,.*supra*, at 28–30; Litigation Relating to Atomic Testing, 1983: Hearings on H.R. 2797 Before the House Subcomm. on Admin. Law and Govt'l Relations of the House Comm. on the Jud., 98th Cong., 2d Sess. 43–47, 52 (1983). The adoption of § 2212, substituting the FTCA as the exclusive remedy for pending radiation injury claims, was a valid and rational exercise of Congress' powers to address concerns touching national defense and security.

Plaintiffs argue, however, that the Act must be viewed not simply as a substitution of remedies, but rather as an abrogation of existing claims. By substituting the FTCA remedy, the claims become subject to dispositive defenses available to the government, including the *Feres* doctrine and the discretionary function exception.[10]

Several courts have considered whether Congress may abrogate pending claims.

In *United States v. Heinszen,* 206 U.S. 370, 27 S.Ct. 742, 51 L.Ed. 1098 (1907), import duties on sugar had been collected without the requisite Congressional authority. After an action had been filed for refund of these illegally collected duties, Congress adopted legislation retroactively authorizing the duties. Rejecting plaintiff's argument that this legislation deprived him of property without due process, the Supreme Court held that inasmuch as Congress had the power to impose these duties in the first place, it could validly ratify their collection after the fact. Even if the right to recover the payments were a vested right, the right would be subject to the Congressional power to legislate in the area. The Supreme Court said:

> But if it be conceded that the claim to a return of the moneys paid in discharge of the exacted duties was in a sense a vested right, it in principle, as we have already observed, would be but the character of right referred to by Kent in his Commentaries, where, in treating of the validity of statutes retroactively operating on certain classes of rights, it is said (Vol. 2 pp. 415, 416)
>
> > The legal rights affected in those cases by the statutes were deemed to have been vested subject to the equity existing against them, and which the statutes recognized and enforced. *Goshen v. Stonington,* 4 Connecticut 209; *Wilkinson v. Leland,* 2 Peters, 627 [7 L.Ed. 542]; *Langdon v. Strong,* 2 Vermont, 234; *Watson v. Mercer,* 8 Pe-

9. Decisions upholding retrospective application of economic legislation which imposes added economic burdens on affected parties also provides support by analogy. *See, e.g., Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* —— U.S. ——, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984) (withdrawal liability under the Multiemployer Pension Plan Amendments Act retroactive for a five month period prior to its enactment). After reviewing prior decisions, the Supreme Court concluded that legislation readjusting economic rights and burdens for a rational purpose may be given limited retrospective effect consistent with due process. *See also Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976).

Statutes, such as the Act, which by their terms operate retrospectively are also supported by the general presumption of validity which attaches to acts of Congress. *Crowell v. Benson,* 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932).

10. The Act does not affect other remedies such as those available under veterans benefit legislation, 38 U.S.C. § 310 *et seq.,* and, in the case of the civilian plaintiffs, under the Federal Employee Compensation Act. 5 U.S.C. § 8101 *et seq.* Veterans benefit programs have recently been amended to liberalize recovery of benefits by veterans suffering from exposure to radiation. *See* Veterans' Dioxin and Radiation Exposure Compensation Standards Act, Pub.L. No. 542, 98 Stat. 2725 (1984).

ters, 88 [8 L.Ed. 876]; 3 Story's Comm. on the Constitution, 267.

Nor does the mere fact that at the time the ratifying statute was enacted this action was pending for the recovery of the sums paid cause the statute to be repugnant to the Constitution. The mere commencement of the suit did not change the nature of the right. Hence again if it be conceded that the capacity to prosecute the pending suit to judgment was in a sense a vested right, certainly also the power of the United States to ratify was, to say the least, a right of as high a character. To arrogate to themselves the authority to divest the right of the United States to ratify is then in reason the assumption upon which the asserted right of the claimants to recover must rest.

*Heinszen,* 206 U.S. at 386–87, 27 S.Ct. at 746–47.

In *Battaglia v. General Motors Corp.,* 169 F.2d 254 (2d Cir.), *cert. denied,* 335 U.S. 887, 69 S.Ct. 236, 93 L.Ed. 425 (1948), plaintiffs had sued to recover additional overtime pay to which they had become entitled under a recent Supreme Court interpretation of the Fair Labor Standards Act. After the actions were filed, Congress adopted the Portal-to-Portal Act of 1947, which eliminated these overtime claims. The court held that Congress, having had the power to adopt the Fair Labor Standards Act to protect interstate commerce, had the power to adopt subsequent amendments to prevent injury to commerce. Inasmuch as the plaintiffs' right to overtime pay was subject to the Fair Labor Standards Act, it was subject also to any later amendments. *See also Seese v. Bethlehem Steel Co. Ship Building Div.,* 168 F.2d 58 (4th Cir.1948). *Cf. Louisville & Nashville Railroad Co. v. Mottley,* 219 U.S. 467, 31 S.Ct. 265, 55 L.Ed. 297 (1911) (Congress could, in the exercise of the commerce power, prohibit enforcement of contracts for free transportation valid when made).

Finally, in *de Rodulfa v. United States,* 461 F.2d 1240 (D.C.Cir.), *cert. denied,* 409 U.S. 949, 93 S.Ct. 270, 34 L.Ed.2d 220 (1972), the district court had set aside a Veterans' Administration order and awarded benefits and attorneys' fees to plaintiffs. Congress then amended the governing statute, superceding prior decisions so as to preclude judicial review of Veterans' Administration orders. The court of appeals upheld retroactive application of the amendment, interpreting it as simply implementing Congress' preexisting intent to preclude judicial review of all benefits decisions of the Veterans' Administration.

Although these decisions do not purport to articulate a clearly defined doctrine, they reflect a coherent rationale under which claims relating to matters within the legislative power of Congress are subject to the subsequent exercise of that power to abrogate them. *See also, Paul v. United States,* 687 F.2d 364, 231 Ct.Cl. 445 (1982), *cert. denied,* 461 U.S. 927, 103 S.Ct. 2086, 77 L.Ed.2d 297 (1983); *Inupiat Community v. United States,* 680 F.2d 122, 230 Ct.Cl. 647, *cert. denied,* 459 U.S. 969, 103 S.Ct. 299, 74 L.Ed.2d 281 (1982).

That rationale has particular force when applied to these cases. Plaintiffs' claims arise solely out of the performance of purely governmental functions. To the extent such functions were performed by government employees, the FTCA would be the exclusive remedy. Even when performed by the contractors, they were performed under the comprehensive and pervasive direction and control of the government. The detailed Operation Plans under which the contractors functioned were the product of decisions of the AEC, the Department of Defense and the President, and were subject to oversight by the Joint Committee on Atomic Energy.

Thus the claims arise out of circumstances and activities peculiar and unique to the government as sovereign. They are the product of acts and decisions by the government undertaken for purely governmental purposes. They can in no way be equated with the claim of an injured person against a private tort feasor. *See Feres,* 340 U.S. at 141–42, 71 S.Ct. at 156–57.

These considerations, in the aggregate, present ample grounds for treating plaintiffs' claims as subject to the continuing control of Congress. Congress could, before the actions were filed, have limited the remedy for any claims for radiation injuries resulting from nuclear weapons tests to that provided by the FTCA. The continuing concern of the government with the effective defense of claims arising out of its activity as a sovereign, the cost of such claims, and their impact on contractors on which the government depends to perform essential functions and hence on the performance of those functions provide ample ground for the exercise of continuing control over such claims, even after the commencement of litigation. Given the presumption of validity of acts of Congress, the application of § 2212 to these cases must be upheld.

Plaintiffs also contend that the Act, even if valid as applied to them, results in a compensable taking. In a classic example of understatement, the Supreme Court has said that "[t]he question of what constitutes a 'taking' for purposes of the Fifth Amendment has proved to be a problem of considerable difficulty." *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 123, 98 S.Ct. 2646, 2658, 57 L.Ed.2d 631 (1978). It is helpful at the outset to recognize that " '[a] claim of *deprivation* of property without due process of law cannot be blended as one and the same with the claim that property has been *taken* for public use without just compensation.' " *Kizas v. Webster,* 707 F.2d 524, 539 (D.C.Cir.1983)., *cert. denied,* — U.S. ——, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984) (quoting J. Sackman, *Nichols' The Law of Eminent Domain* § 4.3 at 187 rev. 3d ed. cum. supp. 1982) (emphasis in original). The Court has heretofore concluded that the requirements of due process have been satisfied.

While a cause of action is considered to be a species of property, as heretofore dis-

cussed, those words do not translate into a cognizable taking claim. *See In re Aircrash in Bali, Indonesia on April 22, 1974,* 684 F.2d 1301, 1312 (9th Cir.1982). Whether such a claim exists is subject to an "essentially ad hoc, factual inquir[y]." *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659. Both the nature of the property right and of the governmental invasion must be considered.

Unlike contract claims, the tort claims asserted here lack "investment-backed expectations." *Penn Central,* 438 at 124, 98 S.Ct. at 2659. *Cf. Lynch v. United States,* 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934). Not only are they contingent by their nature, but they also arise in a field in which the law remains to be developed. *See, e.g., Molsbergen v. United States,* 757 F.2d 1016, 1020–25 (9th Cir. 1985).

The governmental action, moreover, does not abrogate the claims but subjects them to the tort claims procedure which the plaintiffs could reasonably expect might be applied. This is true, notwithstanding the naming of contractors as defendants, because the claims arose out of activities conducted by the government and the contractors were named for the obvious purpose of escaping the well-known limits on the government's waiver of sovereign immunity. For these reasons, the Court concludes that plaintiffs do not have a taking claim.[11]

## 2. *The Separation of Powers Issue*

■ Congressional attempts to alter the rule of decision in pending cases in favor of the government have been condemned as a violation of Article III. *See United States v. Klein,* 80 U.S. (13 Wall.) 128, 146–47, 20 L.Ed. 519 (1871); *United States v. Sioux Nation of Indians,* 448 U.S. 371, 404, 100 S.Ct. 2716, 2735, 65 L.Ed.2d 844 (1980). The instant cases, however, do not fall within that prohibition. Section 2212 does

---

11. It appears that § 2212, in providing that an action under the FTCA "shall be exclusive of any other civil action or proceeding for the purpose of determining civil liability arising

from any act or omission," would in any event preclude litigation of plaintiffs' claims in the Claims Court to ascertain their value for compensation purposes.

not withdraw jurisdiction from the federal courts, does not deprive a party of the benefit of a judgment, and does not mandate the outcome of particular cases. It substitutes remedies but it leaves the application of the rules of law, including any defenses, for judicial determination. *See Dames & Moore v. Regan*, 453 U.S. 654, 685, 101 S.Ct. 2972, 2989, 69 L.Ed.2d 918 (1981).

> [T]he better reading of *Klein* is quite narrow and construes the case as holding only that Congress violates the separation of powers when it presumes to dictate "how the Court should decide an issue of fact (under threat of loss of jurisdiction)" and purports to "bind the Court to decide a case in accordance with a rule of law independently unconstitutional on other grounds."

*United States v. Brainer*, 691 F.2d 691, 695 (4th Cir.1982) (quoting P. Bator, D. Shapiro, P. Mishkin & H. Wechsler, *Hart & Wechsler's The Federal Courts and the Federal System* 316 n. 4 (2d ed. 1973)). Since the Act neither directs the courts to make a certain finding of fact nor requires them to apply an unconstitutional law, the separation of powers doctrine is not offended. *See also Battaglia*, 169 F.2d at 262.

Section 2212 is therefore a valid exercise of Congressional power. The United States must be substituted as the defendant in place of the contractors, and the contractors dismissed from these actions.

### III. *The Government's Motion to Dismiss or For Summary Judgment*

Under § 2212, these actions must be treated as having been brought against the United States under the FTCA. The FTCA is a limited waiver of sovereign immunity subject to certain statutory and judicial exceptions. The government has moved to dismiss or for summary judgment on the ground that each plaintiff's claims are barred by one or more of those exceptions.

### A. *The Discretionary Function Exception*

The FTCA excludes any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The government raises the discretionary function exception as a defense to all claims raised by all plaintiffs.

#### 1. *Claims arising out of acts or omissions in connection with the detonation of nuclear weapons*

■ Plaintiffs' first category of claims is based on injuries caused by their exposure to radiation from nuclear weapons. They may be summed up as resting on alleged negligent failures to take adequate safety precautions at the test sites.

Plaintiffs acknowledge that the decision to conduct the tests is covered by the discretionary function. They contend, however, that the Court must examine each challenged act or omission to determine whether, in the light of the policies underlying the exception, it is of the type that Congress intended to protect. According to plaintiffs, many of those acts involved only the exercise of what they refer to as "scientific or professional judgment" in implementing an overall decision to conduct the atomic weapons testing program and hence are not covered by § 2680(a). *See e.g., Driscoll v. United States*, 525 F.2d 136 (9th Cir.1975). In addition, they argue that the government can be held liable for failing to enforce its own safety requirements.

The fountainhead of jurisprudence relating to the discretionary function exception is *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). The continuing vitality of that decision was recently affirmed in *United States v. S.A. Empresa de Viacao Aerea Rio Grandense* ("*Varig*"), ——— U.S. ———, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). *Dalehite* involved claims for damages against the United States arising out of a disastrous explosion of ammonium nitrate fertilizer, which had been produced and distributed under the di-

rection of the United States for export to areas occupied by the Allied Armed Forces after World War II. Numerous acts of the government were charged as negligent: the cabinet-level decision to institute the fertilizer export program, the failure to experiment with the fertilizer to determine the possibility of explosion, the drafting of the basic plan of manufacture, and the failure properly to police the storage and loading of the fertilizer.

The Supreme Court concluded that these allegedly negligent acts were governmental duties protected by the discretionary function exception and held the actions barred by § 2680(a). Describing the discretion protected by § 2680(a) as "the discretion of the executive or the administrator to act according to one's judgment of the best course," 346 U.S. at 34, 73 S.Ct. at 967, the Supreme Court stated:

> It is unnecessary to define, apart from this case, precisely where discretion ends. It is enough to hold, as we do, that the "discretionary function or duty" that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable.

*Id.* at 35–36, 73 S.Ct. at 967–68 (footnotes omitted). In the course of its opinion, the Supreme Court analyzed the legislative history of the FTCA. It noted that "congressional thought was centered on granting relief for the run-of-the mine accidents, as

distinguished from injury from performing discretionary governmental functions," *id.* at 28, n. 19, 73 S.Ct. at 964, n. 19, and concluded that in § 2680 "Congress exercised care to protect the Government from claims, however negligently caused, that affected the governmental functions." *Id.* at 32, 73 S.Ct. at 966.[12]

*Dalehite* is squarely on point. The argument made by plaintiffs in that case, and rejected by the Supreme Court, was essentially the same as that made here, i.e. that the charges were directed not at

> "any Cabinet decision ... [but] only to the mistakes of judgment and the careless oversight of Government employees who were carrying out a program of manufacturing and shipping fertilizer and who failed to concern themselves as a reasonable man should with the safety of others."

*Id.* at 35, 73 S.Ct. at 967 (quoting petitioners' arguments).

The specific acts of negligence charged were the temperature at which the fertilizer was bagged, the coating and bagging materials used, and the labelling of the bags. *Id.* at 39, 46–57, 73 S.Ct. at 969, 973–79. The Supreme Court found all of these acts covered by the discretionary function exception because they were "performed under the direction of a plan developed at a high level under a direct delegation of plan-making authority from the apex of the Executive Department." *Id.* at 40, 73 S.Ct. at 970.

The case presented by plaintiffs is congruent with *Dalehite*. Plaintiffs chose to focus their arguments on the conduct of Operation Crossroads.[13] There, too, a detailed and extensive Operation Plan was adopted on orders from the highest levels

12. The Supreme Court added: "So we know that the draftsmen did not intend it to relieve the Government from liability for such common-law torts as automobile collision caused by the negligence of an employee...." 346 U.S. at 34, 73 S.Ct. at 967.

13. Plaintiffs' Op.Br. at 3. That operation, according to plaintiffs, epitomizes the nuclear

weapons testing program at its worst: "In hindsight Operation Crossroads was an extraordinary fiasco, America's first nuclear disaster. The Joint Task Force took a radiation bath without adequate resources to deal with the decontamination problems that ensued." *Id.* at 76.

of the Executive Department.[14] An integral part of that Plan was an extensive Safety Plan which, according to plaintiffs, at first lacked but later contained a plan for decontamination.[15] The Safety Plan described anticipated radiation hazards, established exposure limits, and assigned responsibility for protecting personnel against exposure to unknown hazards.[16]

Plaintiffs' contention is that the government's scientists who prepared the plan "failed to appreciate or prepare for the magnitude of the hazards that would result." Plaintiffs' Statement of Facts at 16. They argue that "AEC and military officials were responsible for developing safety plans to carry out Presidential and cabinet and agency-level directives to conduct the planned detonations without unduly jeopardizing the safety of the participants; for ensuring that all participants except those performing unusual or high priority missions such as cloud sampling were not subjected to radiation doses exceeding the exposure limits established by the plan; and for following other safety guidelines established in the plan, such as decontamination measures and use of protective clothing and gear.... There is substantial evidence that their negligent failure to carry out these operational tasks resulted in the overexposure of many hundreds or thousands of test participants, including the safety monitors themselves." Plaintiffs' Op. Br. at 30.

The nuclear weapons tests on which these actions are founded were carried out pursuant to specific legislative authority in the 1946 Atomic Energy Act, and its successor, the 1954 Atomic Energy Act, 42 U.S.C. § 2011 et seq., and presidential order.[17] They were conducted for the purpose of developing and testing weapons and discovering their effects, an inherently dangerous undertaking. The Safety Plan developed for each test series was designed to minimize exposure to radiation consistent with the purposes of the tests. The Plan provided that "[r]adiological safety of all military and civilian personnel is a command responsibility."[18] While the Plan established radiation exposure limits, it was subject to the authority of the officer in charge of any particular test, who could permit exposure in excess of the established level if the exigencies of the situation required. Thus the Plans specified that compliance with exposure limits was conditioned upon operational requirements:

Due to the special nature of field tests it is considered that a policy of strict adherence to the radiological standards prescribed for routine work is not realistic. The regulations set forth herein have been designed as a reasonable and safe compromise considering conservation of personnel exposures, the international import of the test and the cost aspects of operational delays chargeable to excessive radiological precautions. In all cases other than emergencies or tactical situations, the ultimate criteria will be limited by the MPEs [maximum permissible exposure] for personnel. Special instances may arise ... in which operations will be carried out without regard to the MPEs and MPLs [maximum permissible level] prescribed herein. For such emergency or tactical operations the criteria prescribed below for tactical situations will be used as a guide.[19]

---

**14.** Government Exhibits E–7.10–7.15. Operation Plans for subsequent tests may be found at Government Exhibits E–8 (Operation Buster-Jangle), E–9 (Operation Castle), E–10 (Operation Redwing), E–11 (Operation Hardtack), E–12 (Operation Ivy), and E–13 (Operation Dominic I).

**15.** Government Exhibits E–7.3 to E–7.7. Extensive Safety Plans were a part of the Operation Plan for each test. See, e.g., Operation Plan for Operation Castle, Government Exhibit E–9, at N–I to N–III–2.

**16.** Plaintiffs' Statement of Facts, at 11–16.

**17.** See Government Exhibits E–14 to E–26.4.

**18.** Government Exhibit I–4, at 1. See also Government Exhibits J–5, at 3; I–1, at 3; E–11, at K–1; J–3 at 1.

**19.** Joint Task Force Seven, Command Task Group 7.3, Operation Plan, December 7, 1953, Government Exhibit J–21, at G–I–1. See generally references cited in Government Memo. in

The Safety Plan incorporated into the Operation Plan contemplated that judgments and decisions concerning exposure to radiological hazards and the degree of protection to be afforded would be made in the light of the objectives and the needs of the test program. Safety decisions, therefore, were a part of the policy decisions made in the conduct of the weapons tests,[20] and they fall squarely within the articulation in *Dalehite* that

> [w]here there is room for policy judgment and decision there is discretion.

346 U.S. at 36, 73 S.Ct. at 968. That those judgments and decisions may have been made by scientists or other operational personnel does not affect the application of the discretionary function exception. As stated by the Court in *Varig*, "it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies...." 104 S.Ct. at 2765.

Even under the pre-*Varig* decisions of the Ninth Circuit, the result is the same. The court has used three criteria to determine whether to apply the discretionary function exception: (1) whether the decision was made at the planning level or the operational level;[21] (2) whether the judiciary is in a position to evaluate the act or omission; and (3) whether judicial evaluation would impair the effective administration of the government. *Nevin v. United States*, 696 F.2d 1229, 1230 (9th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 70, 78 L.Ed.2d 84 (1983). Applying those criteria to these actions, decisions concerning safety were in the first instance made by those charged with the preparation of the Operation Plan and its components. The respon-

sibility for carrying out the Safety Plan was assigned to the officials in charge of the tests who had discretion to adopt and modify the Plan as necessary to achieve the objectives of the test. A court would be ill-equipped to evaluate the judgments concerning safety made by those officials based on the exigencies of the moment. Any attempt to do so would, moreover, require a comprehensive reexamination of the conduct of the tests and the decisions made during their course which would itself defeat the purpose of the exception. The consequences of such a reexamination would be to hamper the government in its future conduct of weapons tests and similar operations affecting the national security.[22]

Accordingly, plaintiffs' claims based on failures to take adequate safety precautions at tests must be dismissed.[23]

2. *Claims Based on the Government's Failure to Issue Warnings Prior to 1977*

■ Plaintiffs' second category of claims is based on the breach of the government's alleged duty to warn plaintiffs of the dangers to which they had been exposed or to monitor test participants for health problems resulting from radiation exposure. The Ninth Circuit has postulated that California courts would impose a duty on the government to warn test participants of the dangers to which they have been exposed. *See Molsbergen v. United States*, 757 F.2d 1016, 1020–25 (9th Cir.1985). Such a duty would exist when a test participant could show that (1) the government has information relating to a serious risk to

---

Support of Summary Judgment (Discretionary Function) at 772–777.

**20.** *See also* the discussion at pp. 762–63, *supra*.

**21.** The continuing vitality of this criterion is in doubt in view of the Supreme Court's statement in *Varig* that "it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function applies...." 104 S.Ct. at 2765.

**22.** The appropriateness of deciding issues of governmental immunity on summary judgment to avoid unnecessary inquiries disruptive of effective government was stressed by the Supreme Court in *Harlow v. Fitzgerald*, 457 U.S. 800, 816–17, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

**23.** Although plaintiffs do not assert claims arising out of non-discretionary acts or omissions at the test sites (such as an automobile accident), such claims would also be barred by the *Feres* doctrine and in some cases the foreign country exception. *See infra* at pp. 776–79.

the life, safety or health of a participant; (2) the conduct of the government gave rise to the risk; (3) the burden resulting from imposition of a duty to warn is not onerous; and (4) there is reason to believe that a warning would have some practical effect. *Id.* For purposes of this ruling, it is assumed that the government failed to provide plaintiffs with any warning of the health risks of exposure to radiation until 1977.

The government's motion is not directed at whether it had a duty to warn. Rather, the government argues that in these cases the government's failure to warn involved the failure to perform a discretionary function and that the claims are therefore barred.

Assuming the government had a duty to warn, the threshold question in determining whether the discretionary function applies is what, if any, warning measures it was obliged to undertake on behalf of test participants prior to 1977. This is not a case of failing to warn river users of a hidden obstruction beneath the surface, *Lindgren v. United States,* 665 F.2d 978 (9th Cir.1982); or park users of the risk of flash floods, *Ducey v. United States,* 713 F.2d 504 (9th Cir.1983); or a treating physician of his patient's dangerous propensities. *Jablonski v. United States,* 712 F.2d 391 (9th Cir.1983). The kind of "warning" that these cases involve is best illustrated by the program the government did undertake beginning in 1977 on the strength of findings by the Centers for Disease Control of a leukemia cluster among test participants. At that time the Defense Nuclear Agency established the Nuclear Test Personnel Review ("NTPR") program. It began to assemble and publish voluminous materials concerning radiation exposure during tests and to calculate levels of exposure of personnel. Beginning in 1979, test participants whose records indicated significant radiation exposure were notified and provided with medical examinations. The notification and examination program was gradually expanded to include personnel who had received lower doses. It was also extended to the Department of Health, Education and Welfare which began to conduct studies and a public information program.[24]

The decision to embark on this program entailed a commitment of substantial resources, including the assignment of a large number of employees and the expenditure of large sums of money. The initial cost of the NTPR alone was $6,000,000 per year. The program required difficult judgments balancing the magnitude of the risk from radiation exposure—of which there was only fragmentary knowledge—against the risks and burdens of a public program. Those risks included the potential consequences of creating public anxiety and the health hazards inherent in the medical responses to the warning.[25]

Thus any decision whether to issue warnings to thousands of test participants of possibly life-threatening dangers and to provide them with appropriate examina-

**24.** *See* the discussion and references cited at Government Memo. in Support of Summary Judgment (Discretionary Function) at 45–51; Government Reply Memo at 774–77.

**25.** *See* E. Robin, *Matters of Life & Death: Risks v. Benefits of Medical Care* (1984), which discusses the health hazards inhering in any widespread campaign to warn against and detect disease. Diagnostic tests, by reason of the intrusive procedures used, false positive indications, and sometimes unwarranted psychological effects, produce their own adverse consequences which must be taken into account.

The experience under the government's 1976 Swine Flu Program illustrates the hazards of a hasty reaction to a health problem, the dimensions and seriousness of which are not yet known at the time. Although the probability of an epidemic was never established, the public was strongly urged to submit to immunization with little advice respecting its attendant hazards. R. Neustadt, *Swine Flu Affair: Decision-Making on a Slippery Disease* 86–97 (1978); Gray, "Complexities of Informed Consent," 437 *Annals Am. Academy Pol. & Soc. Sci.* 37, 44 (May, 1978); Centers for Disease Control, *Public Attitudes Toward the Swine Flu Immunization Program and Medical Coverage of Events* 2–7 (1981). The government's experience with the swine flu program highlights the policy and cost/benefit tradeoffs involved in large-scale public responses to perceived health problems.

tions and counseling calls for the exercise of judgment and discretion at high levels of government. The difficulty of such decisions is illustrated simply by the problem of how to phrase such a warning where the degree of exposure of any particular participant and the consequent risk is not known.[26] A decision must also take into account sensitive questions concerning its impact on on-going and future tests and on the military and civilian participants.[27]

In no sense can such a decision be equated with decisions to warn of submerged obstructions to navigation or flash floods.[28] Courts cannot be considered qualified to evaluate such a decision and any attempt to do so is likely to interfere with important governmental activities. Formulating and issuing warnings requires the government "to establish priorities for the accomplishment of its policy objectives by balancing the objectives sought to be obtained against such practical considerations as staffing and funding." *Varig*, 104 S.Ct. at 2768. The conclusion is inescapable that every aspect of a warning program is a matter that falls within the discretionary function exception as defined in *Dalehite* and *Varig:*

> Where there is policy judgment and decision there is discretion.

346 U.S. at 36, 73 S.Ct. at 968. The decisions of the Ninth Circuit, discussed in the immediately preceding section, compel the same result.

**26.** Not the least of the problems the government would face is that once having undertaken to issue a "warning", it may come under an obligation to exercise due care toward members of the public relying on it. *See Indian Towing Co. v. United States,* 350 U.S. 61, 69, 76 S.Ct. 122, 126, 100 L.Ed. 48 (1955) (not decided under the discretionary function exception).

**27.** Studying the psychological reactions of troops to nuclear weapons during field tests was a specific goal of many of the tests. *See, e.g.,* Characteristics of Troops with Varying Levels of Information about Atomic Effects, Government Exhibit D–67; Memorandum for the AEC Chairman, July 16, 1951, Government Exhibit K–14. To carry out such studies and achieve test objectives, the government needed complete control over information supplied to the troops. Troops were to be indoctrinated on how to

Plaintiffs argue that the discretionary function exception cannot apply in the absence of a "conscious decision."[29] The statute is not so limited; it exempts "[a]ny claim based upon ... the failure to exercise or perform a discretionary function ..." 28 U.S.C. § 2680(a) The language is directed at the nature of the conduct, and does not require an analysis of the decision-making process. *Cf. General Public Utilities Corp. v. United States,* 745 F.2d 239, 245 (3d Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 1227, 84 L.Ed.2d 365 (1985) (the exemption is based on the nature of the conduct, "not whether there is an option to choose"). When enacting § 2680, "Congress exercised care to protect the Government from claims, *however negligently caused,* that affected the governmental functions." *Dalehite,* 346 U.S. at 32, 73 S.Ct. at 966 (emphasis added).

If the decision to issue or not to issue a "warning" is within the discretionary function exception, then logically the failure to consider whether to issue one necessarily falls within the exception as well. Any other interpretation of the statute would create insurmountable problems in its administration: What would constitute a "decision"? Would a decision to defer decision be a "decision"? Would the government be subject to liability for failing to act where operational employees conducting the relevant research consider the evidence

conduct themselves on the nuclear battlefield. As one officer explained, the goal was to teach soldiers to respect radioactivity, not to fear it. Capt. Frank Winant, Command Problems of Atomic Defensive Warfare, Sept. 1947, Government Exhibit J–13.

**28.** *See, Begay v. United States,* 768 F.2d 1059 (9th Cir.1985); *First Nat'l Bank in Albuquerque v. United States,* 552 F.2d 370, 374–77 (10th Cir.), *cert. denied,* 434 U.S. 835, 98 S.Ct. 122, 54 L.Ed.2d 96 (1977) (decision by Department of Agriculture whether label on fungicide complied with statutory requirement that it contain a warning "necessary and if complied with adequate to prevent injury" fell within discretionary function exception).

**29.** *See Allen v. United States,* 588 F.Supp. 247, 337–40 (D.Utah 1984).

as yet insufficient for making a decision? As the Supreme Court said in *Varig,* one must look to "the nature of the conduct" to determine whether the exception applies. In this case, the relevant conduct is the issuance of "warnings," not the decision-making process or the failure to make a conscious, explicit decision.

Accordingly, plaintiffs' claims based on the failure to issue warnings must also be dismissed.

## B. *The Feres Doctrine*

■ The government argues that claims on behalf of servicemen are also barred by the exception created in *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950). That case held that the FTCA does not to extend to "injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." *Id.* at 146, 71 S.Ct. at 159. *Feres* thus bars claims resulting from radiation exposure allegedly sustained while in the military service, and those claims must accordingly be dismissed.

*Feres* does not, however, bar claims arising out of an independent tort committed by the government subsequent to a serviceman's discharge. *Brown v. United States,* 348 U.S. 110, 75 S.Ct. 141, 99 L.Ed. 139 (1954). In *Broudy v. United States,* 661 F.2d 125 (9th Cir.1981), the Ninth Circuit considered this limitation on *Feres* in the context of a claim for injury to a serviceman arising out of exposure to radiation from atmospheric nuclear weapons tests. Plaintiff alleged that the government should be held liable for violation of a continuing duty to the serviceman to warn, monitor and treat him after discharge.

The court rejected the continuing tort argument and held that to be cognizable under the FTCA, the claim must be based on an

> independent, post-service negligent act on the part of the Government.... The Government's failure to warn Major Broudy of and monitor any possible injuries arising from his exposure to radiation might constitute such an act if the Government learned of the danger after Major Broudy left the service.

661 F.2d at 128–29.[30]

Unlike *Broudy* and *Molsbergen,* these cases are before the Court, not on the pleadings, but on the record made on defendant's motion for summary judgment. The undisputed facts before the Court show that test officials knew and understood throughout the periods in question that exposure to nuclear radiation created a health hazard. By the early 1940's a large body of literature existed on the subject.[31] The literature included studies documenting radiation poisoning of workers painting watch dials with radium to make them glow in the dark, and linked exposure to radium radiation to an increased risk of cancer.[32] In August, 1946, the government knew that radiation emitted by the test explosions was "the most toxic chemical yet known," with a microscopic amount constituting a lethal dose to man.[33] By September, 1946, the Manhattan Engineer District Medical Advisory Committee recognized that radiation could cause genetic effects, histopathological changes, physiological changes, and biological and enzymatic disturbances.[34]

Shortly after the tests at Operation Crossroads were conducted, Colonel Warren, the officer in charge of radiation safe-

---

**30.** More recently the issue came before the Ninth Circuit again in *Molsbergen v. United States,* 757 F.2d 1016 (9th Cir.1985), discussed *supra* at pp. 774–77.

**31.** *See Allen v. United States,* 588 F.Supp. 247, 358–70 (D.Utah 1984); Warren, "The Role of Radiology in the Development of the Atomic Bomb," at 920–21 in K. Allen, *Radiology in World War II* (1966) (bibliography of pre-1945 scientific literature on biological effects of radiation), Government Exhibit J–15.

**32.** *See* Plaintiffs' Exhibits 41–42.

**33.** Memorandum from Colonel Warren to Commander Task Group 1.2, at 1 (August 13, 1946), Plaintiffs' Exhibit 36.

**34.** *See* Recommendation of the Manhattan Engineer District Medical Advisory Committee, September 5–6, 1946, at 2–2, Government Exhibit J–9.

ty at those tests, delivered an address on the effects of radiation in which he observed:

> Later when the decay reduced the gamma radiation to safe levels you would be subject to dangerous hazards in [the test area]. This would not be lethal in the sense of being immediately dangerous. There is a potential and actual absorption hazard. You need only to absorb a few micrograms of plutonium and other long-life fission materials, and then know that you are going to develop a progressive anemia or a tumor in from 5 to 15 years. This is an insidious hazard and an insidious lethal effect hard to guard against.[35]

Colonel Warren also knew by that time that exposure to radiation could cause cancer:

> [E]xtremely small amounts [of beta and gamma emitters] deposited in the marrow will eventually cause progressive anemia and death years later. Tumor formation has a high incidence. This is true in higher doses for most radioactive metals and can be predicted by any shrewd knowledgable [sic] layman.[36]

He recommended that certain medical information be declassified and civilian groups be told that the radiation effects from the explosion of a nuclear bomb are

> much like the problem of radium dial painters. The amount necessary to cause this hazard is minute—measured in millionths of a gram. The harmful effects occur years later.[37]

These contemporaneous acknowledgments of the hazardous effects of radiation show that the government was aware at all relevant times that radiation exposure had the potential for causing a variety of serious health problems, including the injuries claimed by plaintiffs.

The evidence also shows that scientific understanding of the health effects of radi-

ation exposure advanced after detonation of the first atomic bomb in 1945. In the years following Operation Crossroads, studies of the health risks from radiation exposure continued. In 1952 studies by government contractors indicated an elevated incidence of leukemia among persons exposed to the explosions at Hiroshima and Nagasaki.[38] In 1957 reports based on studies of survivors of those bombings indicated that there may be no safe doses of radiation below which no risk of leukemia, lung cancer and genetic damage exists.[39]

The permissible radiation exposure limitations, however, were changed only marginally during this period. In 1945, at the time of the Manhattan Project, the recommended exposure limitation was set at 0.1 roentgen (R) per day. In 1949 the AEC had adopted 0.3 R per week as the base level guideline for test participants, with a maximum permissible exposure level of 3.9 R during any consecutive 13-week period. In 1956 international and national guidelines for occupational exposure to radiation were set at 5 R per year, and that standard has since remained essentially unchanged.

This evidence establishes beyond dispute that throughout the period involved, the government had knowledge, albeit incomplete, of the nature and degree of the danger to test participants. As another court has noted, while "hard experimental evidence of somatic effects, especially cancer and leukemia, of exposure below the permissible limits of 0.3 R per week was largely lacking, [by 1950] potential risk was not ignored [by government officials]." *Allen v. United States*, 588 F.Supp. 247, 360 (D.Utah 1984).

Plaintiffs' case is premised on "the existence of a cognizable duty to warn former servicemen of hazards to which they were exposed during their military service...." Plaintiffs' Op.Br. at 91. They do not dis-

---

**35.** Transcript of Lecture by Colonel Warren, October 7, 1946, at 21–22, Government Exhibit J–10.

**36.** Memorandum to Major General Groves from Colonel Warren, October 9, 1946, at 1, Government Exhibit J–11.

**37.** *Id.* at 2.

**38.** *See* Plaintiffs' Exhibits 43, 45.

**39.** *See* Plaintiffs' Exhibits 46–59.

pute that the government had knowledge of the risks of radiation exposure when plaintiffs were exposed but they argue that "its knowledge subsequently *expanded* to such a point that a new duty to warn of the danger arose." *Id.* at 92 (emphasis in original).

No facts are put forward by plaintiffs which would permit a trier of fact to find the commission of an "independent post-service negligent act." According to plaintiffs' own evidence, the government knew since at least 1946, prior to any of the tests and within a year of Hiroshima, that servicemen at test sites would be exposed to potentially lethal doses of radiation. Had there been a duty to warn servicemen of a dangerous condition, that information clearly was sufficient to trigger it. The facts show that the government's knowledge continued to increase over the years following 1946. Evidence accumulated of the relationship of radiation exposure to disease. The increases in knowledge were, however, quantitative, not qualitative, providing confirmation of risks that had been presumed but not proved to exist. The record reflects no act or omission following the discharge of any plaintiff or decedent from which the commission of an independent, post-discharge tort could be found. It precludes the existence of such proof, moreover, in view of the undisputed knowledge of the government at all relevant times that it had exposed test participants to life-threatening risks during the tests.[40] Accordingly, even apart from the discretionary function exception, defendant is entitled to summary judgment on all claims asserted by or on behalf of servicemen. *See Heilman v. United States,* 731 F.2d 1104 (3rd Cir.1984); *Gaspard v. United States,* 713 F.2d 1097 (5th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2354, 80

L.Ed.2d 826 (1984); *Lombard v. United States,* 690 F.2d 215 (D.C.Cir.1982), *cert. denied,* 462 U.S. 1118, 103 S.Ct. 3086, 77 L.Ed.2d 1347 (1983); *Laswell v. Brown,* 683 F.2d 261 (8th Cir.1982), *cert. denied,* 459 U.S. 1210, 103 S.Ct. 1205, 75 L.Ed.2d 446 (1983).

### C. *Foreign Country Exception*

The FTCA excludes from coverage "[a]ny claim arising in a foreign country." 28 U.S.C. § 2680(k). To the extent plaintiffs seek to recover on the basis of negligent acts or omissions which occurred in a foreign country, their claims are barred. *United States v. Spelar,* 338 U.S. 217, 70 S.Ct. 10, 94 L.Ed. 3 (1949).

Plaintiffs' argument in opposition to the motion for summary judgment is susceptible to the interpretation that liability is sought to be imposed for a negligent failure to carry out adequate safety procedures to prevent radiation exposure. *See* Plaintiffs' Op. Br. at 30–33. Claims resting on negligent acts or omissions in Japan,[41] the Marshall Islands[42] or at Christmas Island[43] are therefore barred.

### D. *The Combatant Activities Exception*

The FTCA excludes from its coverage "[a]ny claim arising out of the combatant activities of the military or naval forces ... during time of war." 28 U.S.C. § 2680(j). The Molsbergen, Minarik and Solano complaints allege that plaintiffs' decedents were exposed to radiation during World War II while conducting military operations in Japan at the time of the nuclear explosion there. To the extent the claims are based on injuries incurred at that time, they must be dismissed. *Miller*

**40.** Plaintiffs have requested further discovery but have not demonstrated how further discovery might establish commission of a post-discharge tort. That request is therefore denied.

**41.** *Molsbergen v. United States; Minarik v. United States; Solano v. United States.*

**42.** *Beaman, Benson, Carsillo, Collins, Cordray, DeMuth, Erspamer, Estes, Ferguson, Guarisco,*

*Milne, Paskett, Saraiva, and Van Winkle v. United States.* The Marshall Islands are considered to be a foreign country. *Callas v. United States,* 253 F.2d 838, 840 (2d Cir.), *cert. denied,* 357 U.S. 936, 78 S.Ct. 1384, 2 L.Ed.2d 1550 (1958).

**43.** *Harrison v. United States.*

*v. United States*, 643 F.2d 481, 486 (8th Cir.1980).

## CONCLUSION

For the reasons stated, the following order is hereby entered:

A. With respect to the *Ryder* action (83–5642), that action is severed for further proceedings consistent with this memorandum of opinion and order.[44]

B. With respect to all of the remaining actions listed in notes 1–2 *supra:*

1. The United States will be substituted as the defendant in place of the contractors.

2. The contractors will be dismissed from the actions.

3. The actions will be dismissed under the discretionary function exception.

4. In addition the claims brought by or on behalf servicemen and those portions of claims brought on behalf of Smith that occurred while Smith was a member of the military will be dismissed on the alternative ground of the *Feres* doctrine.[45]

5. In addition the claims brought by Molsbergen, Minarik and Solano based on exposure to radiation during military exercises will be dismissed on the alternative ground of the combatant activities exception.

6. In addition the claims in the Molsbergen, Minarik, Solano, Beaman, Benson, Carsillo, Collins, Cordray, DeMuth, Erspamer, Estes, Ferguson, Guarisco, Milne, Paskett, Saraiva, Van Winkle, Williams, Blake, Porambo, Dixon, Fassett, Harrison, Green, Stephens, King, and Hinkle actions based on government conduct that occurred at Hiroshima, Nagasaki, the Marshall Islands, or Christmas Island will be dismissed on the alternative ground of the foreign country exception.

7. The state law claims for medical malpractice in the Hinkle action (85–2138), are remanded to state court, and counsel are directed to submit an appropriate form of order.

IT IS SO ORDERED.

**44.** *See* note 4 *supra.*

**45.** *See* note 1 *supra.*